# Richmond

## JAMES THOMAS v. COMMONWEALTH OF VIRGINIA.*

October 13, 1947.

Record No. 3248.

Present, Hudgins, C. J., and Gregory, Eggleston, Spratley and
Buchanan, JJ.

*For opinion on rehearing, see 187 Va. 265.—REPORTER'S NOTE.

The opinion states the case.

*P. A. L. Smith, Jr.*, for the plaintiff in error.

*Abram P. Staples, Attorney General, M. Ray Doubles, Assistant Attorney General*, and *Ballard Baker*, for the Commonwealth.

*HUDGINS, J., delivered the opinion of the court.

This writ of error brings under review the proceedings of a trial in which James Thomas was convicted of murder in the first degree for killing his aunt, Mattie Hall, and sentenced to life imprisonment.

The dominant question presented is whether the evidence is sufficient to sustain the verdict.

Mattie Hall, who lived at the home of Hampton Cooper, in Goochland county, failed to return home on Monday, March 4, 1946. Search for her was begun on Tuesday and continued until Thursday morning, March 7, when her body was found in Lickinghole Creek near the aqueduct about eight feet from the bank in water ten feet deep. A fishing pole was entangled in her clothing and projected several feet out of the water. The base of her skull was fractured, apparently by a blunt instrument. There was a deep stab in the back of her neck. No water was found in her lungs. These facts established the *corpus delicti*—the death of the victim by criminal violence of another.

The accused lived near his aunt, Mattie Hall, but was employed in Richmond. On Monday afternoon he was seen driving his aunt in her automobile. He went to

---

*Note.—Owing to circumstances over which we had no control, the preparation of this opinion had to be reassigned.

Richmond in his aunt's car Monday night and returned to his home Wednesday afternoon, when he was informed that his aunt was missing. He made no suggestions to the searchers, nor did he offer his aid in finding her. He spent Wednesday night in Richmond but returned to his home again Thursday morning. When questioned, he told the deputy sheriff and others that on Monday afternoon he had taken his aunt to, and left her at, a place known as Sherman's Gap near a covered bridge, the opposite direction from the place where the body was found. The accused went with the deputy sheriff to the spot designated but no footprints, which would have been easily seen in the sand if made, were found. The deputy sheriff then became suspicious of the truthfulness of the accused and took him to the sheriff at Goochland court house. There, in the presence of the sheriff and others, the accused repeatedly said that his aunt had gotten out of the car at the covered bridge with $50 cash, which he had given her, in her pocketbook. The accused seemed more interested in finding the $50 than in ascertaining the whereabouts of his aunt.

It seems that other searchers found the body of the victim while the sheriff was questioning the accused. The accused was taken to the aqueduct and there, with the body in sight, he stated that he did not know when or how his aunt or her body had reached the spot. After further questioning, the accused was informed that he and his aunt had been seen in an automobile passing Irwin's station on Monday afternoon. He then admitted that he and the deceased had passed Irwin's station, but said that they had turned the car around before getting to the creek and that he had carried her to the covered bridge and left her. The accused was unable to point out any place where a car had turned between the station and the aqueduct.

H. D. Ragland, the station agent, stated, in the presence of the accused, that he had seen Mattie Hall and the accused on Monday afternoon going towards the aqueduct and that, within an hour's time, he had seen the accused coming back in the car alone. The accused contradicted Mr. Ragland

and told him that Mattie Hall was with him in the car when he came back. Later the accused admitted that he had carried Mattie Hall a portion of the way up the creek and let her out to go fishing. The accused stated that Mattie Hall intended to go to New York, that he had paid her $50 for the use of her car while she was gone, and that she had put the money in her left hip picket. Her pocketbook containing personal effects, but no money, was found on the body.

Douglas Glover and Willie Winston testified that on Monday afternoon, March 4, they drove to within fifty yards of the creek at the aqueduct and that, as they did so, the accused, with an iron rod in his hand, ran from the creek towards them and said that they had scared him and that he thought he had left his car on the road so they could not pass. He appeared excited and was sweating profusely. The car in question was not in the road and the witnesses drove past it and turned around. They informed the accused that they were looking for Ronie Perkins and Mary Turner, who were supposed to be fishing there. The accused informed these witnesses that he had seen these young ladies leave Irwin's station about an hour previously with Sallie Martin. The accused, on being asked who was fishing at the creek, replied: "No one's up there but me," and stated that he was looking for bait.

Ronie Perkins and Mary Turner testified that they did not see the accused on March 4, and that they did not go back home with Sallie Martin but hitch-hiked a ride on Sam Norton's truck.

Robert Miles, a boy about 12 years of age, testified that he lived with his aunt, Mattie Hall; that, coming home from school on Monday afternoon, he met the accused and his aunt driving away in an automobile; that just before dark on that day the accused came back alone, and in reply to a question, said: "I left her (Mattie Hall) at the covered bridge. She is coming on up through the bushes." After further conversation, the accused asked this boy: "Where are you going to stay?" The boy replied: "I may stay

with you." The accused said: "No, you ain't. Aunt Mattie ain't coming back." The witness did not know whether the accused meant that his Aunt Mattie was going to New York or not. He knew that his Aunt Mattie was planning to go to New York. The accused then gave the boy fifty cents and left.

This witness further said that his Aunt Ophelia, the mother of the accused, told him that if he would testify he would get $5.

There was evidence tending to show that a fishing hook, to which was attached a line and pole, was fastened in the back of the sweater of the victim; that the body was straight; and that there had been some bleeding from the stab wound in the throat severing the jugular vein. It was also proven that when the body was taken from the water the legs were bent at least fifteen degrees, the arms were bent, the body stiff, the head could be moved. The coroner stated that *rigor mortis* usually develops within three to four hours after death, and that cold water prolongs *rigor mortis* and it may continue for seven or eight days. However, the coroner was unwilling to fix the hour of the death.

Other witnesses stated that, on Tuesday, March 5, between 3:00 and 4:00 P.M., they saw the fishing pole sticking up out of the water at the spot where the body was found, but no examination was made of this until Thursday morning. This, together with other evidence, is sufficient to overcome the testimony of Mrs. Ragland, who stated that she saw Mattie Hall in a moving car pass Irwin's station Tuesday afternoon.

The only fair inference from all the testimony is that the murder was committed and the body placed in the water some time after 5:00 P.M. on Monday, March 4, 1946.

The conviction of the accused does not rest wholly upon his false statements of material facts, to which much weight is always given (*Massie* v. *Commonwealth*, 140 Va. 557, 125 S. E. 146), but upon these and other circumstances which may be summarized as follows: (1) The accused was the last person to see Mattie Hall alive; (2) he

was at the scene of the crime about the time the murder was committed; (3) he seemed excited, had a blunt instrument in his hand, and made false statements, evidently in order to keep the two witnesses from going down to the creek; (4) his failure to aid the searchers for his aunt and his deliberate attempt to lead them in the opposite direction from the place in which his aunt had last been seen alive and where her body was found; and (5) his false statements regarding his movements on the day the crime was committed.

We held, in *Dean* v. *Commonwealth*, 32 Gratt. (73 Va.) 912, 926, that the circumstantial evidence is sufficient to support a conviction where time, place, motive, means and conduct concur in pointing out the accused as the guilty agent. All of these circumstances are present in the instant case except proof of motive. The presence or absence of motive is not proof of a substantive fact although its absence does strengthen the presumption of innocence. See *Ferrell* v. *Commonwealth*, 177 Va. 861, 14 S. E. (2d) 293.

The conduct and statements of the accused, detailed in the evidence, from Monday afternoon until some time after the body was found reveal a guilty conscience and are inconsistent with innocence. See *Bonner* v. *Commonwealth*, 141 Va. 395, 126 S. E. 198.

The accused's explanation of his conduct and his excuses for his incriminating statements to others after his aunt disappeared are too feeble to convince the most gullible. The jury was fully justified in disbelieving any statement made by this self-confessed falsifier.

The only other assignment of error is the admission, over the objection of the accused, of the deputy sheriff's testimony to the effect that the accused "seemed more concerned over not finding the $50 than he was over Mattie's death."

The general rule governing admissions of testimony of this character was discussed in *Mohler* v. *Commonwealth*, 132 Va. 713, 727, 111 S. E. 454, where this was said: "This subject has been recently considered by this court in the case of *Chesapeake, etc., R. Co.* v. *Arrington*, 126 Va. 194,

202, 101 S. E. 415. It is there held that answers of this character, which relate to a matter not requiring expert knowledge, are admissible. Such statements are not mere opinions, but impressions drawn from observed facts, sometimes called the 'collective facts rule.' " See 20 Am. Jur., Evidence, secs. 823-4; 32 C. J. S., Evidence, sec. 459, *et seq.* The admission of this testimony was not error.

The judgment of the trial court is affirmed.

*Affirmed.*

SPRATLEY, J., dissenting:

The late Mr. Justice Browning participated in the hearing of this case on appeal. Prior to its final decision, he departed this life. In the meantime, he had written and submitted to the court the following opinion:

"This appeal involves only the question of whether the evidence is sufficient to support the conviction. The petitioner assigns error to the ruling of the court on the subject of the admissibility as evidence of certain statements of the deputy sheriff relating to his impressions of the state of mind of the accused with regard to certain incidents connected with the crime charged.

"It becomes unnecessary to pass upon this assignment, as we shall have to reverse the case upon the error of the trial court in refusing to set aside the verdict of the jury as contrary to the law and evidence. The facts stated as briefly as we can are these:

"On the afternoon of Monday, March 4, 1946, the accused, a young man of about 22 years of age, with a good reputation, born and reared in the county of Goochland, Virginia, in company with his aunt, Mattie Hall, was seen driving in her car. They passed Irwin Station, going in the direction of Lickinghole Creek. A short while thereafter, he drove back from the direction of the creek, alone. Mattie Hall was about 45 years of age and lived in that vicinity. She was very fond of fishing and frequently engaged in

that recreation. She and the accused maintained the automobile jointly, and each kept keys thereto. He had just paid for insurance on the car which he used at will. He and his aunt were on perfectly good terms. They had never had a quarrel. He said he left her at the edge of the overgrowth about 50 yards from her accustomed fishing place. On his way back he stopped at the station, drew a bucket of water from a well, putting some of it into the car, and drove to his home, whence he drove to Richmond to be in place the next morning for his work at the Southern Dairy.

"He worked in Richmond Tuesday and Wednesday, when he got a letter from a member of the family, stating that Mattie Hall had never come home. He drove to his home that night, about 35 miles from Richmond, and drove back from Richmond the next morning, and found a searching party, with the deputy sheriff, looking for Mattie Hall. Three or four hours later the searchers found her at the bottom of the creek, at the fishing hole near the place where accused had left her on the morning of Monday, the 4th. A fishing pole was sticking up out of the water and the hook was fastened in her sweater. The water at that place was some 9 or 10 feet deep. When she was pulled on the bank, the coroner found a stab in her neck and her skull fractured. In his opinion, she was killed, not drowned.

"Undoubtedly, the record presents evidence and incidents which were highly prejudicial to the defendant's case and tended strongly to point to him as the destroyer of the life of his aunt. The most inculpatory of these incidents and evidence is the testmony of two small colored boys that the accused, when he went home, after leaving his aunt at the creek, asked one of them (the boys) where he was going to stay, the accused saying, 'Aunt Mattie ain't coming back.' Again, before leaving for Richmond, he said that he had let his aunt out at the covered bridge and she was going to walk home; that on Wednesday night when he drove up from Richmond and also the following morning he stated to several persons that that was the place where he left her;

that the searchers could not find any tracks in that vicinity; that on Thursday afternoon, after the body was found he denied that Mr. Ragland, the agent at Irwin, had seen him coming back alone from the direction of the creek; that he admitted that this denial and his statements as to letting his aunt out at the covered bridge were false; that he was seen near the creek on the morning of the 4th, with an iron bar in his hand and that he was much agitated and sweating; that Mattie Hall was never seen at her home after the morning of the 4th when the accused left her near the creek; that the deputy sheriff testified that the accused seemed much more concerned about not finding the $50.00 he had given her than he was over her death. A pocketbook was found on her person, but there was no money in it.

"The alleged significance of the testimony of the boy as to what the accused said with reference to their aunt not coming back is disproved by the fact which was revealed that he and his aunt were going to New York together on Saturday and she was to remain there to work, A letter from the accused to his mother throws light upon this otherwise inculpatory incident:

"'12 East Main Street
Richmd, Va.

" 'My Dear Mother

" 'Just a few lines to let you here form me I got your letter and was glad to here form you I was out home yesterday and went to fishing a wile, Mattie told me to tell you and rose that she was coming up their 8th and I am coming wif her and she told me to take the car and she ask me to gene here $50 and gave it to here she so funy you cant beleve what she say Sow I hope to see you the 8th sow give my love to all and be good

" 'Form you son James'

"The boy, Robert Miles, testified that he did not know whether the accused, in making the statement, 'Aunt Mattie ain't coming back,' referred to her going to New York. The effect, of course, of this is to weaken the testimony. The iron rod turned out to be a jack handle which the ac-

cused said he used to prop up the hood while he was working on the old car. It is most significant that the jack handle had no blood stain on it and it was in the possession of the Commonwealth but was not introduced in the evidence. The accused testified that it was hard to get the car started when once stopped and on that account he had to prop up the hood often. The statement is made by the accused that the Commonwealth did not even claim that the jack was the instrument with which Mattie Hall was struck. This was not denied in the Commonwealth's brief except inferentially.

"The testimony of Mrs. H. D. Ragland, the wife of the station agent, was very clear and positive. She said that she had known Mattie Hall about 25 years; that she saw her on Tuesday, March 5; that she came down the road in a car and spoke to her; that she, Mrs. Ragland, was on the station platform about 30 feet from the car; that a man was in the car and it was not the accused; that this was between 12:00 noon and 2:00 P. M., that it was not a cold day; that they were going in the direction of the creek; that she did not see Mattie Hall come back; that she thought it was her car because she was driving it; that it was a faded car; that the window was down and Mattie waved at her; that she remembered the date because her husband was in Goochland at a board of supervisors meeting and she was in charge at the Post Office.

"The Commonwealth sought to parry the effect of this testimony, so damaging to its case, by introducing a woman named Elizabeth Mealy, who said that she went to the creek fishing on Tuesday, March 5; that Mrs. Ragland was at Irwin Station when she passed around 3:00 o'clock; that she spoke to Mrs. Ragland; that Charlie Mealy was driving.

"The force of this is weakened by the fact that Mrs. Ragland said that Mattie was driving the car when she spoke to her and waved at her.

"The Commonwealth's case is also impaired by the fact that it seriously questioned the truth of the accused's statement that he ever gave his Aunt Mattie the $50.00 and at the

same time bases its claim of the great agitation and concern of the accused on account of the loss of the money. The incident is used to show that he was more troubled over this than over the death of his aunt. It considered it of sufficient importance to have the deputy sheriff testify to his impressions of the state of agitation. This, of course, would imply a deplorable baseness of character.

"The evidence is completely lacking as to showing any motive on the part of the accused for the commission of the crime. They were friendly. They had lived together for a long period and they were preparing to take a trip to New York together. He had brought her a bottle of whiskey from Richmond. All of this is antagonistic to the revolting idea of killing her.

"The Commonwealth entered the realm of conjecture to find the existence of a motive. It said that the accused and his aunt might have disagreed and quarreled about the money or the use of the car. The weakness of this, of course, is that there is no evidence to support it.

"In the case of *Ferrell* v. *Commonwealth*, 177 Va. 861, 14 S. E. (2d) 293, it was said:

" 'The evidence relied upon by the Commonwealth is wholly circumstantial, and no motive has been shown; but motive, or its absence, is not proof of a substantive fact, although it does strengthen the presumption of innocence.

" ' "Motive not a necessity—The presence or absence of motive in cases depending wholly on circumstantial evidence is not a factor that determines either the guilt or the innocence of the accused. Proof of motive does not establish guilt, nor want of it establish innocence; but while such proof is not a necessity, it is of great importance, and the absence of motive is a factor for the consideration of the jury, but only as bearing on the question whether or not the crime was committed by the accused." Wharton's Criminal Evidence, 10 Ed. Vol. II, section 878. Wigmore on Evidence, section 1119.'

"It is elementary that the burden of proof is upon the

Commonwealth. That it has not successfully met this burden is apparent. The case is enshrouded in doubt.

"In the face of the presumption of innocence which surrounds every person accused of crime, all surmise, conjecture and speculation must be discarded."

I, too, am unable, after consideration of the record, to find sufficient evidence to show the guilt of the defendant beyond all reasonable doubt. The relations between the defendant and Mattie Hall were disclosed to be of the most friendly nature. There were no circumstances indicating any reason for the defendant to desire the death of Mattie Hall. He is obviously a young negro of very low mentality. His inculpatory statements are readily attributable to his ignorance and inexperience. It seems to me that a conclusion of his guilt can be reached only by conjecture or surmise.

I concur in the opinion of the late Mr. Justice Browning that the judgment of the trial court should be reversed for insufficiency of the evidence to support a conviction. However, I think that the judgment should be reversed and the case remanded for a new trial, if the Commonwealth be so advised.