WILLIAM JEFFERY CANTRELL

V.

COMMONWEALTH OF VIRGINIA

Record No. 840269

Decided April 26, 1985, at Richmond

Present: All the Justices

*John C. Lowe (S. Strother Smith, III; Lowe & Jacobs, Ltd.*, on brief), for appellee.

*John H. McLees, Assistant Attorney General (Gerald L. Baliles, Attorney General*, on brief), for appellee.

RUSSELL, J., delivered the opinion of the Court.

After an earlier trial had ended in a hung jury, William Jeffery Cantrell was convicted of the first-degree murder of his wife, Judy, and of the use of a firearm in the commission of the murder. The second jury fixed punishment at life imprisonment for murder, plus one year on the firearm charge. We granted him an appeal limited to three issues: whether his due process rights were infringed when private counsel, employed by the victim's family, played the dominant role in the prosecution; whether the court erred in excluding expert medical opinion testimony proffered in support of the defense theory of the case; and whether the court erred in instructing the jury with respect to the necessity for proof of malice.

The evidence was entirely circumstantial. Judy Cantrell was killed by two shotgun blasts as she was climbing the steps toward the side door of the Cantrell home, about 9:00 p.m. on December 8, 1981, while returning alone from a karate class. Her husband, the defendant, was at home, but the couple's only child was visiting the defendant's parents, who lived next door. The shotgun belonged to the defendant and was kept in the home.

Within a few minutes after the shotgun blasts were heard, the defendant called his parents' home for help. The rescue squad arrived soon thereafter and found Judy dead at the foot of the steps, outside the home, and the defendant lying unconscious. He was taken to the Norton Community Hospital where he recovered consciousness but was hysterical, incoherent, and hyperventilating. His blood pressure was elevated and his face flushed. He had superficial facial scratches and an inconspicuous bruise on the forehead. There were no marks on the back of the head and no signs of serious head injury.

The defendant gave a statement to the police in which he said that he had entered his home about 6:40 p.m., thinking that nobody was present. He said that as he entered the kitchen, he was "struck over the head by a hard object with much force," and was seized by three persons whom he could not identify. He said that he "passed out," and when he "came to," his hands and legs were tied, he was face down on the linoleum floor of the kitchen, and a large man was sitting on his back. He said that he was hit on the head several times with a hard object, that the assailants would frequently "bang [his] head on the floor," that a water glass was broken on the back of his head, and that he was kicked in the stomach. He testified that he heard sounds indicating that the

house was being ransacked and then heard his wife's car pull into the carport. He called out to warn her, but was again hit over the right ear and on the back of the head with a hard object, after which he heard two shotgun blasts. He said he then heard the perpetrators gathering up the goods they had stolen from the house and running out the back door. He eventually freed himself from his bonds, found his wife dead of shotgun wounds at the foot of the steps leading to the side door, called his parents for help, and "after going into shock, woke up at Norton Community Hospital."

The police found the Cantrell home in disarray, but many items of value, including Judy's rings, a camera, and several firearms, were undisturbed. The defendant gave the police a list of items missing from the home. These items were found in a field on the Cantrell property. Although rain and snow fell that night, a tracking dog was brought to the scene about three hours after the murder. The dog found a scent leading from the back of the house to a boundary fence around the field in which the missing items were recovered, but found no trail leading away from the property. Instead, the dog returned to the house. A palm print found inside the house belonged neither to the defendant nor to Judy, but no other fingerprints were recovered at the scene, on the shotgun, or on the items found in the field. A soil sample taken from a bathroom window sill matched soil behind the house, but was different from samples taken from defendant's shoes. A broken drinking glass was found on the kitchen floor.

Four months after the murder, a Wise County deputy sheriff received an anonymous telephone call in which a man with a voice which sounded "similar" to the defendant's suggested that a search of a planter box outside a hardware store in the town of Pound would reveal evidence which would convict another man of the crime. Under newly disturbed soil in the planter box, the deputy found a pistol and underwear from the Cantrell home and two old photographs of Judy. A witness testified that he had seen the defendant in Pound, near the flower box, three days before the anonymous call was received.

The Commonwealth introduced evidence that the defendant, at the time of the murder, had been conducting an adulterous relationship for a year with a married woman. Both parties to the relationship professed continuing devotion to their respective spouses and a strong desire to preserve their marriages.

Carl McAfee, a lawyer in private practice in Wise County, was employed by the parents of Judy Cantrell to "help to get Jeff Cantrell convicted." Judy's father testified that he incurred fees due to Mr. McAfee amounting to $10,000.00 for these services. Mr. McAfee testified that he had not been formally appointed as a special prosecutor or as an assistant Commonwealth's Attorney, was not being paid by the Commonwealth, and had not taken any oath of office. He frankly informed the jury on voir dire that he was "employed by [Judy's parents]" to "assist the Commonwealth." In closing argument, he stated, "I am speaking to you in behalf of the Commonwealth as a Special Prosecutor for the family of Judy Cantrell. . . ." Although the Commonwealth's Attorney was present throughout the trial and took an active role, Mr. McAfee was clearly lead counsel. He examined most of the witnesses, made and responded to most of the motions and objections, and made the closing argument to the jury.

Judy Cantrell's father had also retained Mr. McAfee in a civil case to seek a change of custody of the Cantrells' only child from the defendant to Judy's parents. The defendant argues that this employment gave Mr. McAfee a conflict of interest which rendered his participation in the criminal prosecution improper to a degree which denied the defendant due process of law. The defendant points out that Mr. McAfee's task in obtaining the child's custody for his clients, the child's grandparents, would be greatly facilitated if the defendant were convicted of murder. Further, the defendant argues that a murder conviction would bar his right to inherit from his deceased wife and would set the stage for a wrongful death action against him, all to the benefit of Mr. McAfee and his civil clients. Thus, he contends, the private prosecutor had an incentive, which the Commonwealth's Attorney lacked, to secure his conviction for reasons other than the impartial administration of justice. The defendant argues: "[t]he fact that there should need to be argument to the jury that the prosecution was biased because it was bought with private money for private vengeance creates entirely the wrong atmosphere for a criminal trial." He points out that the role of privately employed prosecutors developed during a time when Commonwealth's Attorneys were not required to be members of the bar. The defendant argues that, since the adoption of statutory amendments requiring bar membership for Commonwealth's Attorneys, Code §§ 15.1-40.1

and 24.1-86, all justification for private prosecutors has been eliminated.

█ The right of a citizen to hire a private prosecutor is rooted in the early common law of England. Criminal prosecutions, like civil actions, were conducted within the framework of a pure adversary system. The Crown did not provide a public prosecutor in routine felony cases; rather, the victim or his family retained private counsel to prosecute and the defendant retained counsel to defend. *State* v. *Atkins*, 261 S.E.2d 55, 57 (W.Va. 1979), *cert. denied*, 445 U.S. 904 (1980). *See generally* Note, *Private Prosecution—The Entrenched Anomaly*, 50 N.C.L. Rev. 1171 (1972). We have approved the practice, expressly or by implication, in many of our earlier cases. *McCue's Case*, 103 Va. 870, 1004, 49 S.E. 623, 630 (1905); *Jackson's Case*, 96 Va. 107, 112, 30 S.E. 452, 453 (1898); *Sawyers* v. *Commonwealth*, 88 Va. 356, 357, 13 S.E. 708, 708 (1891); *Hopper, Stiers and Lemmon's Case*, 47 Va. (6 Gratt.) 684, 685 (1849). Only one conviction has been reversed because of the participation of a private prosecutor, *Compton* v. *Commonwealth*, 163 Va. 999, 1004-06, 175 S.E. 879, 882 (1934), but the reversal was ordered not because the private prosecutor appeared, but rather because he was in fact employed by the clerk and the sheriff, whose duty was to serve the court impartially.

█ The policy arguments advanced by the defendant for a total prohibition of privately employed prosecutors may have a sound basis in considerations of public policy, but we think it advisable to leave to the General Assembly such a basic change in the long-established common law of Virginia. Nevertheless, without disturbing the common-law rule which generally permits the appearance of private counsel to assist the prosecution, we conclude that Mr. McAfee's role, in the circumstances of this case, infringed the defendant's right to a fair and impartial trial.

█ The common-law right of a crime victim, or of his family, to assist the prosecution with privately employed counsel is not absolute, but lies within the discretion and continuing control of the trial court. *State* v. *Atkins*, 261 S.E.2d at 58-59. A private prosecutor is subject to the same high standard of conduct in the trial of the case as is a public prosecutor. *State ex. rel. Moran* v. *Ziegler*, 244 S.E.2d 550 (W.Va. 1978). It follows, in our view, that he is absolutely prohibited from taking any position, making any argument, offering any evidence, or advocating any cause which would be forbidden to a public prosecutor.

■ His role is more limited than that of the public prosecutor. By the weight of authority, he may not initiate a prosecution or appear before the grand jury, *Nichols* v. *State*, 17 Ga. App. 593, 87 S.E. 817 (1916); *Flege* v. *State*, 93 Neb. 610, 142 N.W. 276 (1913); he may appear only by leave of the trial court, *State* v. *Davis*, 203 N.C. 13, 26, 164 S.E. 737, 744 (1932); he may participate only with the express consent of the public prosecutor, *State* v. *Bartlett*, 105 Me. 212, 74 A. 18 (1909); he may make a closing jury argument only in the court's discretion, *Sawyers* v. *Commonwealth*, 88 Va. at 357, 13 S.E. at 708; and he may take no part in a decision to engage in plea bargaining, deciding the terms of a plea bargain, or a decision to accept a plea of guilty to a lesser crime or to enter a *nolle prosequi, see Ganger* v. *Peyton*, 379 F.2d 709, 712-13 (4th Cir. 1967). Although there is no arbitrary limitation as to the proportion of work which may be done by a private prosecutor, *State* v. *Atkins*, 261 S.E.2d at 59, the public prosecutor must remain in continuous control of the case, *State* v. *Moose*, 310 N.C. 482, 489, 313 S.E.2d 507, 512-13 (1984).

We said in *Macon* v. *Commonwealth*, 187 Va. 363, 373, 46 S.E.2d 396, 401 (1948), that it is as much the duty of a Commonwealth's Attorney to protect his fellow citizens from unjustified prosecutions as it is to prosecute the guilty. His duty is "to seek justice, not merely to convict." Virginia Code of Professional Responsibility EC 8-10, Vol. 11, Code of Virginia at 258 (1984 added volume).

■ A lawyer who represents the victim of a crime, or the victim's family, in a civil case arising out of the occurrence which gives rise to a criminal prosecution, for which he is hired as a special prosecutor, necessarily incurs a conflict of interest. He cannot serve two masters. His duty to administer the criminal law impartially, in the interest of justice, is essentially a judicial one. *Griffin* v. *U.S.*, 295 F. 437, 439-40 (3d Cir. 1924). He also has undertaken a duty to represent the interests of his civil client with undivided fidelity and zeal. The likelihood of conflict between these two duties rises to the level of an overwhelming probability.

Examined from another viewpoint, the private prosecutor is prohibited, as stated above, from advocating any cause which would be forbidden to the public prosecutor. Even in jurisdictions in which the Commonwealth's Attorney is permitted to engage in the part-time practice of law he may not undertake the civil represen-

tation of a victim, or the family of a victim, of a crime whose perpetrator he must prosecute. *See* DR 8-101A(2), Vol. 11, Code of Virginia, at 256 (1984 added volume); *see also* Legal Ethics Opinions 236, 268, 285, 303, and 351, Va. State Bar Prof. Handbook (1984 ed.); *see also Ganger* v. *Peyton*, 379 F.2d at 712.

■ We agree with the *Ganger* court that the position of a private prosecutor having a civil interest in the case so infects the prosecution with the possibility that private vengeance has been substituted for impartial application of the criminal law, that prejudice to the defendant need not be shown. A conflict of interest on the part of the prosecution in itself constitutes a denial of a defendant's due process rights under art. I, § 11 of the Constitution of Virginia, and cannot be held harmless error. *See Ganger*, 379 F.2d at 714.

Although the foregoing holding requires reversal, we shall briefly discuss the defendant's two remaining assignments of error because the case may, if the Commonwealth be so advised, go to trial for a third time.

The defendant, as noted above, gave a statement to a deputy sheriff that he had been struck on the head with a hard object, and had "passed out;" that he had received numerous other blows to the head and that a water glass had been broken by a blow to the back of his head. In opening statement at trial, the prosecution, after describing the defendant's statement, indicated that it would show the improbability of the defendant's version by producing evidence that when admitted to the hospital on the night of the murder, the defendant had only a "slight bruise on the front of his head, a little reddish place, and that will be all the testimony about his physical condition with regard to the alleged beatings and bangings and knocking out blow he received to the head."

In order to counter this attack and to corroborate his version, the defendant called as an expert witness Dr. Clelland Blake, a forensic pathologist from Tennessee, who testified that he had examined many head injuries. Defense counsel, referring to defendant's statement to the sheriff, asked: "Let me refer to the statement where it said he was hit in the head, and ask you if a person were hit in the head hard enough to knock him down and to cause him to become unconscious, would that necessarily cause any lumps on the head?" The Commonwealth objected to the question "unless he saw the defendant and unless he has had an opportu-

nity to examine him." The court sustained the objection. Thereafter, defense counsel made three further efforts to rephrase the question, but each was held objectionable. In the jury's absence, the defense proffered Dr. Blake's opinion that while there is, more often than not, "some evidence of an external trauma," a smaller percentage, "perhaps ten to fifteen or twenty percent of the blows to the head don't show external injury." He stated that some blows showing no external injury can be fatal. He explained, "many times we see cases with no external evidence in a particular location, but upon opening the head [during autopsy], we find unexpected hemorrhage and injury."

The defendant assigns error to the exclusion of this evidence, and argues that it was not harmless error because, in closing argument, the prosecution stated to the jury:

> And it doesn't take any Dr. Blake . . . to tell reasonable men and women that if you hit somebody that hard . . . hard enough in the back of the head, you are going to leave something. You are going to leave a knot, you are going to take a gash out, you are going to leave something on the back of that man's head . . . when you hit somebody hard enough to knock them down on the floor, you are going to do a little bit of damage.

The Attorney General responds that the questions to Dr. Blake were not propounded in correct hypothetical form, and that the answers dealt only with possibilities, rather than reasonable probabilities. Thus, he argues, the questions failed to meet the test of *LeVasseur* v. *Commonwealth*, 225 Va. 564, 587-88, 304 S.E.2d 644, 656-57 (1983), and *Spruill* v. *Commonwealth*, 221 Va. 475, 479, 271 S.E.2d 419, 421 (1980), and the answers were not probative of defendant's theory of the case.

In our view, it was error to exclude the proffered testimony. Hypothetical questions are unnecessary where an expert testifies from his own knowledge of the facts disclosed in his testimony, *Walrod* v. *Matthews*, 210 Va. 382, 388, 171 S.E.2d 180, 185 (1969), or, since 1982, where he renders an opinion "from facts, circumstances or data made known to or perceived by such witness at or before the hearing or trial." Code § 8.01-401.1 (1982 Acts, c. 392). The testimony was relevant because it tended to establish the probability or improbability of a fact in issue. *Va.*

*Real Estate Comm.* v. *Bias*, 226 Va. 264, 270, 308 S.E.2d 123, 126 (1983). Its weight was for the jury to determine. *Id.* It was not speculative, and did not, in itself, deal with possibilities rather than probabilities. Rather, it was offered to furnish the jury with empirical data available in the discipline of pathology, and thus to enable the jury to determine the degree of probability for itself. It did not, as the Commonwealth argued to the jury, impart matters of common knowledge. The jury was free to disregard it or to give it little weight, but was entitled to hear it. *See* C. Friend, The Law of Evidence in Virginia § 216 (2d ed. 1983).

Over the defendant's objection, the court instructed the jury: "To prove the charge of murder the Commonwealth does not have to prove a motive for the killing. The presence or absence of a motive may be considered in arriving at your verdict." The defendant concedes that such an instruction is proper in cases where direct evidence, or the defendant's admissions, furnish proof that he was the criminal agent, or even where the evidence, although circumstantial, entirely excludes the possibility of any other criminal agent. The defendant argues, however, that proof of motive is required in cases, such as his, where the prosecution seeks to prove the identity of the criminal agent by purely circumstantial evidence, which does not completely exclude the possibility that another person was the perpetrator.

In support of this proposition, the defendant relies on a line of our decisions dealing with circumstantial evidence, going back to *Dean's Case*, 73 Va. (32 Gratt.) 912 (1879), where we said: "Here, then, we have a case of circumstantial evidence, where *time, place, motive, means* and *conduct* concur in pointing out the accused as the perpetrator of the crime. When these concur . . . the evidence is powerfully strengthened by the total absence of any trace or vestige of any other agent." *Id.* at 926 (emphasis in original) (citation omitted). In *Abdell* v. *Commonwealth*, 173 Va. 458, 470, 2 S.E.2d 293, 298 (1939), we followed *Dean*, but stated the proposition more generally: "The burden is upon the Commonwealth, where circumstantial evidence is relied upon to support a conviction, to show that 'time, place, motive, means and conduct concur in pointing out the accused as the perpetrator of the crime.' " Similar language has been employed in many circumstantial evidence cases. As recently as *Bishop* v. *Commonwealth*, 227 Va. 164, 313 S.E.2d 390 (1984), we said:

We are guided by familiar principles. Where the evidence is entirely circumstantial, all necessary circumstances proved must be consistent with guilt and inconsistent with innocence and must exclude every reasonable hypothesis of innocence. The chain of necessary circumstances must be unbroken. The circumstances of motive, time, place, means, and conduct must all concur to form an unbroken chain which links the defendant to the crime beyond a reasonable doubt. *Stover* v. *Commonwealth*, 222 Va. 618, 623, 283 S.E.2d 194, 196 (1981); *Inge* v. *Commonwealth*, 217 Va. 360, 228 S.E.2d 563 (1976).

*Id.* at 169, 313 S.E.2d at 393.

The defendant misapplies these principles by confusing the species of circumstances which may or may not be available for proof in any given case, with the elements of the crime, which must each be proved in every case if a conviction is to be had. Intent, for instance, is a requisite element in many crimes, but motive is not. Motive is merely a circumstance tending to prove the guilt of the alleged perpetrator, as its absence may tend to show his innocence. It is relevant and probative on the issue of identity of the criminal agent, but it is not an element of any crime. "Motive and intent are not synonymous. Motive is the inducing cause, while intent is the mental state with which the criminal act is committed . . . . The prosecution is never required to prove motive, although it may do so." C. Torcia, Wharton's Criminal Evidence § 170 (13th ed. 1972); P. Herrick, Underhill's Criminal Evidence §§ 54 and 644 (5th ed. 1957). Motive has never been a requisite element of the crime of murder in Virginia, *Van Dyke* v. *Commonwealth*, 196 Va. 1039, 1046, 86 S.E.2d 848, 852 (1955); *Thomas* v. *Commonwealth*, 186 Va. 814, 819, 44 S.E.2d 365, 368 (1947); *Ferrell* v. *Commonwealth*, 177 Va. 861, 873-74, 14 S.E. 2d 293, 298 (1941); *Sutton* v. *Commonwealth*, 85 Va. 128, 135, 7 S.E. 323, 326-27 (1888), or in any other jurisdiction of which we are aware, C. Torcia, Wharton's Criminal Law § 137 (14th ed. 1979).

Our circumstantial evidence decisions do not require that each of the five circumstances of time, place, motive, means, and conduct must individually be proved beyond a reasonable doubt. In *Epperly* v. *Commonwealth*, 224 Va. 214, 294 S.E.2d 882 (1982), we observed that circumstantial evidence comes in infinite variety,

and that it is unnecessary to create artificial rules as to the species of circumstantial evidence which a jury may consider. *Id.* at 228, 294 S.E.2d at 890.

What our circumstantial evidence cases do stand for is the proposition that those circumstances which *are* proved must each be consistent with guilt and inconsistent with innocence, and that they must also be consistent with each other, that is to say, they must *concur* in pointing to the defendant as the perpetrator beyond a reasonable doubt.

The defendant, relying on the above-quoted language which we used in *Bishop, Stover,* and *Inge*, emphasizes the phrases "all necessary circumstances" and "the chain of necessary circumstances must be unbroken," to argue that each of the five circumstances mentioned is essential. That reading joins the two phrases out of context. The first phrase, in its entirety, was: "all necessary circumstances *proved* must be consistent with guilt and inconsistent with innocence and exclude every reasonable hypothesis of innocence" (emphasis added). Thus it is apparent that not all of the listed circumstances must be proved in every case.

The distinction is best shown by the earliest case in which the general principle was stated. In *Sutton*, 85 Va. at 135, 7 S.E. at 326-27, the court instructed the jury: "[I]n all cases where the proof is circumstantial evidence, the time, place, means, opportunity, motive and conduct *or such of these facts as may be proved with other facts, if any*, must all concur in pointing out the accused beyond reasonable doubt as the guilty agent" (emphasis added). Counsel tendered the instruction without the italicized language, but the trial judge added it by interlineation. The defendant assigned error to the change. On appeal, we held: "This appears to have been a proper amendment. It is not necessary, for illustration, to prove a motive. The crime may be clearly established and no motive ever discovered." *Id.* at 135, 7 S.E. at 326-27. We conclude that the jury was correctly instructed in the case before us.

For the reasons stated above, the judgment of conviction will be reversed and the cases remanded for further proceedings consistent with the views expressed herein, if the Commonwealth be so advised.

*Reversed and remanded.*

STEPHENSON, J., concurring in part and dissenting in part.

I concur in the result reached by the majority. I agree that the trial court erred in permitting the private prosecutor to act under the facts presented and in excluding the expert medical testimony. I cannot agree, however, that it was proper for the court to instruct the jury that "the Commonwealth does not have to prove a motive for the killing."

In many cases, this instruction is proper because, generally, motive is not an essential element of murder. *Ward* v. *Commonwealth*, 205 Va. 564, 570, 138 S.E.2d 293, 297 (1964). However, where, as here, the evidence is *wholly* circumstantial, "[t]he burden is upon the Commonwealth to prove beyond a reasonable doubt that *motive*, time, place, means, and conduct concur in pointing out the accused as the perpetrator of the crime." *Inge* v. *Commonwealth*, 217 Va. 360, 366, 228 S.E.2d 563, 568 (1976). (Emphasis added.) *See also Boykins* v. *Commonwealth*, 210 Va. 309, 312, 170 S.E.2d 771, 773 (1969); *Abdell* v. *Commonwealth*, 173 Va. 458, 470, 2 S.E.2d 293, 298 (1939).

This well-established rule has existed in the Commonwealth since *Dean's Case*, 73 Va. (32 Gratt.) 912 (1879). Twice recently, relying upon the rule reiterated in *Inge*, we reversed convictions in wholly circumstantial evidence cases. The most recent was *Bishop* v. *Commonwealth*, 227 Va. 164, 313 S.E.2d 390 (1984), where we said:

> We are guided by familiar principles. Where the evidence is entirely circumstantial, all necessary circumstances proved must be consistent with guilt and inconsistent with innocence and must exclude every reasonable hypothesis of innocence. The chain of necessary circumstances must be unbroken. The circumstances of motive, time, place, means, and conduct *must all concur to form an unbroken chain* which links the defendant to the crime beyond a reasonable doubt.

*Id.* at 169, 313 S.E.2d at 393. (Emphasis added.) (Citations omitted.)

The other case was *Stover* v. *Commonwealth*, 222 Va. 618, 283 S.E.2d 194 (1981), in which we stated:

> We believe the evidence in the present case fails to measure up to the *Inge* standard. We said in *Inge* that, where the

evidence is circumstantial, "all necessary circumstances proved must be consistent with guilt and inconsistent with innocence and exclude every reasonable hypothesis of innocence." We said further that "[t]he chain of necessary circumstances must be unbroken." . . . We do not believe that the circumstances of motive, time, place, means, and conduct *concur in this case to form an unbroken chain* linking the defendant to the murder . . . beyond a reasonable doubt.

The chain breaks down in its very first link. If the defendant's loss to Taylor [the victim] in the dice game can be considered sufficient motive for murder, . . . others than the defendant had a similar motive.

*Id.* at 623, 283 S.E.2d at 196. (Emphasis added.)

In the face of such clear, settled law, I believe that the instruction constituted reversible error, and that, upon remand, it should be refused. In my opinion, the majority has implicitly overruled this line of cases and repudiated a fair and logical rule that has served the Commonwealth well for over a century.