# COURT OF APPEALS OF VIRGINIA

---

**Record No. 0018-25-2**

---

CORNELIUS LAMONT CARRINGTON

v.

COMMONWEALTH OF VIRGINIA

---

Present: Chief Judge Decker, Judges Ortiz and Callins

Argued at Richmond, Virginia

Opinion Issued May 26, 2026[*]

---

**FROM THE CIRCUIT COURT OF HENRICO COUNTY**
L. A. Harris, Jr., Judge[1]

John W. Parsons (John W. Parsons, Attorney at Law, on brief), for appellant.

Liam A. Curry, Assistant Attorney General (Jason S. Miyares,[2] Attorney General, on brief), for appellee.

---

**MEMORANDUM OPINION BY**
**JUDGE DOMINIQUE A. CALLINS**

Cornelius Lamont Carrington appeals his convictions for first-degree murder, conspiracy to commit murder, and use of a firearm in the commission of a felony. He argues the evidence was insufficient to establish an agreement between him and his co-conspirator and to establish that he was the actual perpetrator of the murder. He also contends the trial court abused its discretion in denying him a new trial based on a recanted, after-discovered confession. Finding no error, we affirm the trial court's judgment.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Judge Harris has since retired, effective February 1, 2025.

[2] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

BACKGROUND[3]

In the days leading up to Ronnie Sneed's murder, Carrington and Sneed were involved in two tense encounters. Sneed's neighbor at the All Day Inn was acquainted with Carrington and his girlfriend, who lived together at a Motel 6. Three days before Sneed's murder, Carrington confronted Sneed's neighbor, seeking to retrieve items he left in her car; when she did not immediately produce the items, he threatened to kill her and her children. Sneed intervened, asked his neighbor if she was okay, and told Carrington to leave. Two days later, Carrington arrived outside Sneed's neighbor's room demanding property she was keeping for him. From inside the room, the neighbor heard Sneed approach Carrington, asserting that he told Carrington to stay away. In response, Carrington told Sneed that "it doesn't even matter" and that he was "going to kill [Sneed] anyways."

Surveillance footage from the All Day Inn, the Motel 6, and the Waffle House where Sneed's neighbor worked tracked the events leading up to Sneed's murder. Around 1:30 a.m. on the morning of the murder, Carrington went in and out of his room at the Motel 6, before his cousin, Jerome Carrington, arrived in a silver Buick SUV at 2:30 a.m. Ten minutes later, the two entered the SUV and drove the vehicle to the All Day Inn, arriving at 3:04 a.m. They turned off the car's lights, moved the car multiple times to various parking spots, and ultimately parked next to Sneed's vehicle until 3:13 a.m. From there, they drove to the Waffle House and smoked cannabis with Sneed's neighbor before leaving at 4:08 a.m. Jerome and Carrington then drove to a neighborhood behind the All Day Inn, where cell-site location data confirmed they remained until the time of the murder.

---

[3] Reviewing the sufficiency of the evidence to sustain a conviction requires us to consider the evidence in the light most favorable to the Commonwealth, the prevailing party in the trial court. *Commonwealth v. Cady*, 300 Va. 325, 329 (2021). And if "this opinion discusses facts found in sealed documents in the record, we unseal only those facts." *Brown v. Va. State Bar ex rel. Sixth Dist. Comm.*, 302 Va. 234, 240 n.2 (2023).

At 4:30 a.m., surveillance footage showed two individuals in dark clothing enter the All Day Inn's parking lot on foot. The two moved toward the back stairwell of the motel. Sneed returned to the All Day Inn and parked just moments later. He walked alone toward the stairwell, where footage captured dark figures moving about. One minute later, surveillance cameras recorded the sound of three gunshots coming from the motel. Another resident at the motel awoke to the sound of the gunshots and watched the two figures run to where Jerome and Carrington had parked their car. Carrington was not seen again until surveillance footage recorded him arriving at the Motel 6 at 7:27 a.m. He entered his motel room, later leaving with his girlfriend, a dog, and multiple bags.

Police arrived at the All Day Inn within minutes, finding Sneed dead on the ground by the stairwell. They ultimately recovered Jerome's phone from his residence, where they also found a silver Buick SUV parked in the driveway. The vehicle matched the silver SUV that Carrington was seen in at the Waffle House prior to the shooting. Investigators also collected burnt scraps of cloth and a belt buckle from a firepit outside of a residence on Crawford Street.

Historical cell-site location data corroborated Jerome and Carrington's whereabouts as gleaned from the surveillance footage. Although Carrington's phone remained in the immediate area of the Motel 6 the morning of Sneed's murder, Jerome's phone left the Motel 6 around 2:45 a.m.—around when footage showed him picking up Carrington. From there, Jerome's phone traveled to the All Day Inn, where it remained until 3:13 a.m. The phone then traveled to the Waffle House, leaving at 4:07 a.m. The phone then arrived at the neighborhood behind the All Day Inn at 4:26 a.m., not moving until 4:35 a.m., after the gunshots were recorded. From there, the phone returned to Jerome's residence, before traveling to the Motel 6 at 7:27 a.m., when Carrington was seen returning. Data then shows that both Jerome and Carrington's phones traveled to the Crawford Street residence, at which police later recovered burnt clothing items.

Upon indictments for first-degree murder, use of a firearm in the commission of a felony, and conspiracy, police arrested Jerome and Carrington three months later. After the close of the Commonwealth's case-in-chief at trial, Carrington moved to strike her evidence. He argued that the Commonwealth failed to prove (1) the existence of an agreement to murder Sneed between Jerome and Carrington, and (2) that Jerome or Carrington murdered Sneed. The trial court denied his motion. Carrington renewed his motion at the close of all the evidence, which the trial court again denied. The jury convicted Carrington on all three charges.

Post-trial, Carrington moved the court to set aside the verdict and order a new trial. Carrington proffered a memorandum written by Helen Borges, a criminal investigator he had employed, following her interview with Jerome in prison after Carrington's trial. Jerome told Borges that he shot Sneed three times over a drug deal that went badly earlier in the day and that Carrington was not present or involved in the killing. Jerome indicated he had not believed Carrington would be convicted of murder due to the lack of credible evidence. Jerome stated that Carrington was innocent and that he was willing to testify to that if his attorney approved of the plan.

At Carrington's sentencing hearing, Jerome admitted making the statement to Borges but claimed that it was a lie. Jerome denied that he was the person who shot Sneed. Jerome said that he and Carrington, together, concocted the plan to lie to Borges. Finding that Carrington failed to furnish evidence likely to produce an opposite result on retrial, the court denied Carrington's motion for a new trial. The trial court then sentenced Carrington to life imprisonment, plus 13 years, with 10 years suspended. This appeal followed.

ANALYSIS

Carrington challenges the sufficiency of the evidence to sustain his convictions and the trial court's denial of his motion for a new trial. When we review the sufficiency of the evidence

to support a criminal conviction, we presume the trial court's judgment is correct and do not disturb that judgment unless plainly wrong or without evidentiary support. *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017). But we review a trial court's decision to deny a motion for a new trial based on after-discovered evidence for an abuse of discretion. *Bagley v. Commonwealth*, 73 Va. App. 1, 22 (2021). "A trial court abuses its discretion by failing to consider a relevant factor entitled to significant weight, considering and giving an improper or irrelevant factor significant weight, or committing a clear error of judgment despite considering all proper factors." *Christian Scholars Network, Inc. v. Montgomery County*, 86 Va. App. 600, 613 (2026). We consider each of Carrington's challenges in turn.

I. Conspiracy

Carrington first argues that the Commonwealth's evidence is insufficient to prove that he and Jerome "communicated and made an agreement to commit" murder. We disagree.

To prove conspiracy, the Commonwealth must establish "(1) an agreement between two or more persons, which constitutes the act; and (2) an intent thereby to achieve a certain objective[,] either an unlawful act or a lawful act by unlawful means." *Charity v. Commonwealth*, 49 Va. App. 581, 586 (2007) (alteration in original) (quoting *Hix v. Commonwealth*, 270 Va. 335, 347 (2005)). Put simply, "[c]onspiracy requires a shared intent and joint action." *Hix*, 270 Va. at 347. Participation in the contemplated act, alone, is insufficient; instead, the Commonwealth must establish that the conspirator knew of and voluntarily participated in the agreement to commit a criminal act. *Carr v. Commonwealth*, 69 Va. App. 106, 117-18 (2018). In fact, "the crime of conspiracy is complete when the parties agree to commit an offense. . . . No overt act in furtherance of the underlying crime is necessary." *Charity*, 49 Va. App. at 586 (alteration in original) (quoting *Gray v. Commonwealth*, 260 Va. 675, 680 (2000)).

Since conspiracies are typically "clandestine in nature," the Commonwealth can rarely establish a formal agreement among alleged conspirators. *Carr*, 69 Va. App. at 118 (quoting *Johnson v. Commonwealth*, 58 Va. App. 625, 636 (2011)). Consequently, the Commonwealth may often only establish an agreement between conspirators based on indirect and circumstantial evidence. *Velez-Suarez v. Commonwealth*, 64 Va. App. 269, 277 (2015). The Commonwealth may meet its burden to establish an agreement by showing that conspirators "by their acts pursued the same object, one performing one part and the others performing another part so as to complete it or with a view to its attainment." *Cappe v. Commonwealth*, 79 Va. App. 387, 401-02 (2024). Hence, we recently held evidence sufficient to establish conspiracy where the only evidence of an agreement was "surveillance video show[ing] . . . three men arriving . . . together, walking around . . . together, coming upon [a] victim and simultaneously firing upon him, and running away together." *Id.* at 402.

Here, the jury's finding that Carrington formed a conspiracy with Jerome to murder Sneed is not plainly wrong or without evidentiary support. The day before Sneed's murder, Ward heard Carrington tell Sneed that he was "going to kill [him]." Surveillance footage captured Jerome picking Carrington up in the early morning hours on the day of the murder, and the two promptly driving to the All Day Inn to park next to Sneed's vehicle. Although the two roamed around the area in the hours that followed, they remained close to Sneed's motel. Footage showed Jerome and Carrington return to the motel parking lot on foot and hide in a back stairwell—where Sneed's body was later found—moments before Sneed arrived. And one minute after Sneed arrived and entered the back stairwell, surveillance footage recorded gunshots. Combining Carrington's expressed intent to kill Sneed with Carrington and Jerome's coordinated conduct resulting in the death of Sneed, a reasonable fact finder could conclude that

Carrington and Jerome formed an agreement to commit an unlawful act. *Cappe*, 79 Va. App. at 402.

II. Murder

Carrington next argues that the evidence is insufficient to establish that he is the individual who shot Sneed. We disagree.

The Commonwealth has the burden to prove Carrington's identity as the principal in the first or second degree of Sneed's murder. *Cuffee v. Commonwealth*, 61 Va. App. 353, 364 (2013). This burden may be carried by presenting direct or circumstantial evidence, without distinction between the two. *Commonwealth v. Moseley*, 293 Va. 455, 463 (2017). "Circumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing." *Montague v. Commonwealth*, 40 Va. App. 430, 439 (2003) (quoting *Stamper v. Commonwealth*, 220 Va. 260, 272 (1979)). Circumstantial evidence may establish that an accused was at the *place* of the crime at the *time* it took place, that they had the *motive* and *means* to carry out the crime, and that their *conduct* was consistent with commission of the crime. *See Cantrell v. Commonwealth*, 229 Va. 387, 397 (1985). And though these five circumstances are not necessary to prove that the accused committed the crime, they are "relevant and probative on the issue of identity of the criminal agent." *See id.*

An individual assisting the actual perpetrator of a crime may incur the same level of criminal liability as a principal in the second degree. *Muhammad v. Commonwealth*, 269 Va. 451, 482 (2005). Principals in the second degree encourage, advise, assist, or incite the perpetrator in the commission of the crime. *Id.* A court may convict an accused as a principal in the second degree if they "shared the criminal intent of the party who actually committed the [crime] or [was] guilty of some overt act in furtherance thereof." *Allard v. Commonwealth*, 24 Va. App. 57, 62 (1997) (alterations in original) (quoting *Rollston v. Commonwealth*, 11 Va. App.

- 7 -

535, 540 (1991)). Presence during the commission of the crime, alone, is insufficient to support a conviction of principal in the second degree. *Murray v. Commonwealth*, 210 Va. 282, 283 (1969). But the jury may consider an individual's presence "at the commission of a crime without disapproving or opposing it" as evidence that they "assented thereto, lent to it his countenance and approval, and . . . thereby aid[ed] and abett[ed] the same." *Hampton v. Commonwealth*, 32 Va. App. 644, 648-49 (2000) (quoting *Foster v. Commonwealth*, 179 Va. 96, 100 (1942)).

Here, the jury's finding that Carrington is criminally liable for Sneed's murder is not plainly wrong or without evidentiary support. The jury was properly instructed that a "principal in the second degree is a person who did not actually commit the crime, but rather is present and knowingly assists by helping in the commission of the crime" and that they are "liable for the same punishment as the person who actually committed the crime." Assuming Carrington was not the actual perpetrator of the murder, he (1) expressed an intention to kill Sneed less than 12 hours before the murder, (2) was at the scene of the crime in the moments before and after Sneed's murder, and (3) he and Jerome appeared to wait around for Sneed to arrive and tried to burn their clothing after the fact—conduct consistent with the commission of the crime. *See Allard*, 24 Va. App. at 62 (holding that conviction as a principal in the second degree is permissible if the defendant "shared the criminal intent" of the actual perpetrator); *Cantrell*, 229 Va. at 397 (discussing relevant circumstantial considerations to the issue of identity).

Carrington even concedes that he and Jerome "were present at the time of the murder," only challenging whether he or Jerome pulled the trigger on Sneed. By so arguing, Carrington fails to account for his liability as a principal in the second degree. *See Johnson v. Commonwealth*, 45 Va. App. 113, 116-17 (2005) ("[W]e join the majority of jurisdictions holding that in 'situations in which there is one or more alternative holdings on an issue,' the

appellant's 'failure to address one of the holdings results in a waiver of any claim of error with respect to the court's decision on that issue.'" (quoting *United States v. Hatchett*, 245 F.3d 625, 644-45 (7th Cir. 2001))). Taking his presence at the scene of the crime with the surrounding circumstances, a reasonable fact finder could conclude that Carrington "assented" to the murder, "lent to it his countenance and approval, and was thereby aiding and abetting the same." *Hampton*, 32 Va. App. at 649 (quoting *Foster*, 179 Va. at 100).

III. After-Discovered Evidence

Carrington concludes his appeal by arguing the court should have granted a new trial based on the after-discovered evidence of Jerome's confession. Again, we disagree.

Rule 3A:15(c) authorizes trial courts to grant a new trial if it sets aside the verdict for any reason other than "because the evidence is insufficient as a matter of law to sustain a conviction." After-discovered evidence may justify a new trial if the defendant proves that the evidence (1) "was discovered after the trial;" (2) "could not have been discovered, through the exercise of due diligence, prior to the trial;" (3) "is not merely cumulative, corroborative, or collateral;" and (4) "is material to the extent that it is *likely to produce different results from a new trial*." *Lamm v. Commonwealth*, 55 Va. App. 637, 642 (2010) (emphasis added). This test is stringent, and Virginia appellate courts have rarely "found that a motion for a new trial should have been granted" based on after-discovered evidence. *Id.* at 643.

A post-trial third-party confession may justify a new trial, depending on the audience to whom the confession is made, whether the confession has been consistent or has evolved, and whether the confession can be corroborated. *See Harter v. Commonwealth*, 31 Va. App. 743, 751-52 (2000). Thus, in *Harter*, we upheld a trial court's denial of a motion for a new trial where an after-discovered confession made to a defendant varied over only a couple days, was uncorroborated, and even contradicted by other evidence in the record. *Id.* And, in *Odum v.*

- 9 -

*Commonwealth*, 225 Va. 123 (1983), our Supreme Court concluded a new trial would be inappropriate where an after-discovered confession "would be only the latest in a series of inconsistent statements" made by the confessing party. *Id.* at 130-31.

Here, the trial court did not abuse its discretion in denying Carrington's motion for a new trial based on Jerome's after-discovered confession. Post-trial, Jerome reportedly told Carrington's private investigator that he shot Sneed following a drug deal gone wrong and that Carrington was not present or involved in the killing. But, at a hearing on Carrington's motion for a new trial, Jerome recanted this confession, claiming he lied. As in *Harter*, Jerome's after-discovered confession was inconsistent, uncorroborated, and contradicted the record, including ample evidence demonstrating Carrington's presence at the scene of the murder. *See Harter*, 31 Va. App. at 751-52. That Jerome conveniently only confessed to a private investigator employed by Carrington—rather than the police—also detracts from the confession's credibility. *Id.* Since these credibility issues depreciate the confession's materiality by making the confession less "likely to produce different results from a new trial," the trial court did not abuse its discretion in denying Carrington's motion. *Lamm*, 55 Va. App. at 642.

CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

*Affirmed*.