The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Bost. As the parties have not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives, the Full Commission hereby adopts the Opinion and Award of the Deputy Commissioner with the addition of finding of fact No. 29 and minor modifications to the resulting Order.
***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties are subject to and bound by the provisions of the North Carolina Workers Compensation Act at all relevant times.
2. Hoechst-Celanese, Inc., is a duly qualified self-insured, and ESIS is the Servicing Agent.
3. The employee-employer relationship existed between the parties at all relevant times.
4. Plaintiffs average weekly wage was sufficient to yield the maximum weekly compensation rate for 1993 of FOUR HUNDRED FORTY-TWO AND 00/100 DOLLARS ($442.00).
5. Plaintiff sustained an admittedly compensable injury by accident, arising out of and in the course of his employment on 18 June 1993.
6. The parties submitted medical records into evidence.
***********
Based upon all of the competent evidence in the record, the Full Commission makes the following:
 FINDINGS OF FACT
1. On 18 June 1993, plaintiff sustained an admittedly compensable injury by accident when a hose came loose from an air gun and struck him on his face and his right eye. Plaintiff was admitted to Rowan Memorial Hospital and was treated by Dr. Joseph Jackson. A physical examination showed external marked puffiness of both the upper and lower lids of the right eye with a small laceration on the lids. A patch was placed over the eye, and plaintiff was admitted to the hospital and prescribed Demerol and Phenergan.
2. Plaintiff was discharged from the hospital on 21 June 1993, and diagnosed with the following: (1) severe contusion injury to the right eye and orbit; (2) hyphema; (3) vitreous hemorrhage; and (4) skin lacerations. Plaintiff was greatly improved and was not experiencing any real discomfort.
3. Following his initial discharge from the hospital, plaintiff developed increasing problems with his right eye and was re-admitted for further evaluation. In addition, Dr. Joseph Jackson continued to provide evaluation and treatment.
4. Plaintiff received a psychological evaluation from Dr. Gary L. Patrick on 21 October 1993 and 26 October 1993. On 27 December 1993, plaintiff began outpatient rehabilitation services at Mercy Center for Outpatient Rehabilitation ("MCOR), including physical therapy, occupational therapy, speech therapy, therapeutic recreation, and vocational services. In December 1993, plaintiff was evaluated by Dr. Alexander Manning during his stay at MCOR. Plaintiff was discharged from MCOR on 22 February 1994. According to Dr. Neal Taub, plaintiff had reached maximum medical improvement with a two percent (2%) impairment of the spine (plaintiffs complaints of back pain were found to be of unknown etiology and are not related to his eye injury). Dr. Taub recommended that plaintiff return to work with present functional limitations as outlined in a Functional Capacity Evaluation performed on 9 February 1994.
5. Pursuant to a Form 25R, on 11 March 1994, Dr. Jackson rated plaintiff with a one hundred (100%) loss of his right eye.
6. On 11 October 1994 and 26 October 1994, a neuropsychological evaluation of plaintiff was performed by Dr. Alexander Manning at Health and Rehabilitation Psychologists of Charlotte. The evaluation revealed that plaintiff was performing within normal limits on the most sensitive indicator of brain impairment. Plaintiffs neuropsychological profile was unlike that which is normally associated with traumatic head injury. For that reason, Dr. Manning recommended an evaluation by neurologist to rule out any undetected disease processes.
7. Following Dr. Mannings recommendation, plaintiff was examined by Dr. Ronald Demas with Demas Neurology and Medical Rehabilitation on 30 November 1994. Dr. Demas concluded that the plaintiff had probable conversion hysterical reaction subsequent to his right eye injury. No neurologic deficit was noted.
8. On 13 February 1995, after reviewing Dr. Demas neurological evaluation and in light of the fact that no neurological disorder had appeared, Dr. Manning recommended treatment by a psychologist skilled in dealing with pain and rehabilitation issues.
9. An initial psychological consultation was performed by Dr. Brian OMalley on 1 March 1995. Dr. OMalley concurred with the opinions of Dr. Demas and Dr. Manning that the multitudes of difficulties reported by plaintiff were not the result of a traumatic head injury. Dr. Demas recommended placing plaintiff in a structured treating environment to allow for specific observation of his level of cooperation and motivation for recovery.
10. From 1 April 1996 through 3 May 1996, plaintiff received comprehensive multi-disciplinary treatment and evaluation at Learning Services in Durham. Included in the treatment were physical medicine and rehabilitation, occupational therapy, physical therapy, neuropsychological treatment, speech and language therapy, psychological therapy, and vocational evaluations. Plaintiff also received a comprehensive evaluation from Dr. Thomas Gualtieri, consulting neuropsychiatrist to Learning Services. A patient report prepared by Dr. Gualtieri indicated that plaintiffs only problem was an eye injury, that he had not sustained neurological damage, and that he did not have a psychiatric disorder or post-traumatic stress disorder. Dr. Gualtieri further indicated that malingering was the diagnosis for plaintiffs condition.
11. Plaintiff did not sustain a concussion or any type of brain injury as a result of the 18 June 1993 accident. Plaintiff did not experience loss of consciousness which is an essential finding for a closed head injury or other traumatic brain injury.
12. Plaintiff received neuropsychological evaluations by Dr. Manning in December 1993 and October 1994. Comparing plaintiffs performance on both test dates, his score improved on the category test to the point where it was within normal limits. Nevertheless, plaintiffs other test scores did not improve and actually were significantly worse which is inconsistent with a brain improving from a mild head injury.
13. On 30 November 1994, Dr. Demas saw plaintiff for a neurological consultation at the referral of Dr. Manning. Based on this evaluation, it was clear that plaintiff did not sustain any type of neurological injury or neurologic deficit. The absence of loss of consciousness sustained by plaintiff suggested there had not been a significant impact on the brain cells.
14. Patients who suffer from head injuries should not experience loss of function as time progresses. Instead, the patient should make either steady improvement or reach an eventual plateau.
15. Dr. Demas concluded that malingering was probably the most appropriate diagnosis for plaintiffs condition. Dr. Demas indicated that there was a significant degree of volitional conduct and a conscious awareness on the part of plaintiff.
16. On 1 March 1995, plaintiff was evaluated by Dr. OMalley in an initial psychological consultation. During the course of this evaluation, Dr. OMalley noted a substantial change in plaintiffs demeanor when the conversation shifted to focus on his disability status. Plaintiff began speaking more normally, in a normal volume, and at a normal pace, which was a significant shift in his presentation up to that point.
17. Based upon plaintiffs presentation and inconsistencies observed during evaluation, Dr. OMalley indicated that malingering most accurately described this situation. As defined by Dr. OMalley, "malingering is a conscious process where symptoms are generated deliberately for secondary gain. A patients desire to remain on disability status for a workers compensation case, along with receipt of workers compensation disability benefits, qualifies as secondary gain.
18. During plaintiffs stay at Learning Services, he was examined by Dr. Gualtieri, the facilitys medical psychiatric consultant and Medical Director of North Carolina Neuropsychiatry Clinic. Dr. Gualtieri is board-certified in the field of psychiatry and has published more than one hundred twenty (120) articles which have appeared in scientific literature and three books. Dr. Gualtieri has given invited lectures, both nationally and internationally, and is highly regarded as an expert in the field of psychiatry and neuropsychiatry.
19. A differential diagnosis exists behind plaintiffs presenting condition, his complaints, and medical history. The differential diagnosis is of conversation disorder, factitious disorder, and malingering. During the course of his professional experience, Dr. Gualtieri has seen at least two hundred (200) patients in which he has been asked to address the possibility of malingering as part of the differential diagnosis.
20. According to Dr. Gualtieri, malingering is the most likely diagnosis for plaintiffs condition. Dr. Gualtieri defined "malingering as a willful or conscious exaggeration of ones symptoms or concocting symptoms to gain some particular end; the issue is one of intent.
21. Dr. Gualtieri listed several factors which support the diagnosis of malingering: (1) the development of plaintiffs symptoms are wildly out of proportion to the actual trauma; (2) the complete absence of any other possible neurological or medical explanation for plaintiffs deterioration; (3) the severe nature of plaintiffs symptoms and the extreme inconsistency of these symptoms; and (4) the inconsistent presentation of plaintiffs symptoms occurs in the context of Social Security Disability and workers compensation disability. Plaintiffs inconsistencies all are self-serving in that his presentation while being evaluated for a neurological program is wildly impaired, but he shows virtually no impairment at all when focused on legal matters. Finally, plaintiffs response to Dr. Gualtieri when confronted with a possibility of a cure supports the diagnosis of malingering. Instead of responding with any expression of emotion, plaintiffs response was of "perfect aplomb, showing neither anger nor relief.
22. Dr. Gualtieri testified that plaintiff has the textbook presentation of malingerer, and that he has an excuse to pretend to be disabled. In addition, Dr. Gualtieri noted that plaintiff has the mental and physical capacity to support himself and to support his family.
23. If it were not for plaintiffs malingering and apart from his eye injury that could restrict his work activities, Dr. Gualtieri was unaware of any other restriction that plaintiff should have on the basis of his condition. If plaintiff were not malingering and apart from any restrictions which may be associated with his eye injury, he could return to full-duty employment.
24. Dr. Gualtieri spent about an hour and a half reviewing medical records from Learning Services, discussing the observations with Learning Services staff, and seeing plaintiff. This is sufficient to establish the diagnosis of malingering, which was entirely consistent with the opinions expressed by Drs. Demas, OMalley and Manning.
25. There is a complete lack of medical evidence to support the opinion of Dr. John Barr, a family practitioner employed by Cleveland Primary Urgent Care, who has treated plaintiff since 15 May 1992 for a number of different conditions, many of which were admittedly unrelated to his accident of 18 June 1993. Dr. Barr opined that plaintiff in 1997 was diagnosed with thoracic outlet syndrome and reflex sympathetic dystrophy caused by the injury of 18 June 1993.
26. Thoracic outlet syndrome and reflex sympathetic dystrophy, according to Dr. Barr, almost never develop without a known cause, and trauma to the upper chest and neck almost always contribute to the development of this condition. Dr. Barr agreed that the accident of June 1993 would have to have involved some type of trauma to the upper chest and neck for plaintiff to have developed thoracic outlet syndrome four years later as a result of that accident. There is no competent medical evidence to show that plaintiff received any type of trauma to his upper chest and neck during the course of the 18 June 1993 accident in which he was struck on the head and right eye. None of the medical reports generated from plaintiffs initial hospital stay at Roman Memorial Hospital show any indication of traumatic injury to the chest or neck.
27. Assuming, as the evidence shows, that plaintiff was struck in the facial area on his eye but was not struck about the neck and chest areas, Dr. Barr was unable to state that the diagnosis of thoracic outlet syndrome and reflex sympathetic dystrophy, more likely than not, was proximately caused by the 18 June 1993 accident.
28. Dr. Barr is a family practitioner and, as such, he does not have the kind of training that would allow him to make the differential diagnosis that is present in plaintiffs case. Although there are experts whose expertise involves distinguishing between a differential diagnosis of factitious disorder, conversion reaction, and malingering, Dr. Barr is not one of those experts. As such, his testimony that plaintiff has an organic cause for his clinical presentation, and that, therefore, he is not malingering, is not afforded the weight given to the testimony of Dr. Gualtieri and is specifically rejected.
29. Any inability of plaintiff to return to full time work following his medical release is not related to his compensable injury or any disability resulting therefrom. Rather, the sole cause of plaintiffs inability to return to work is plaintiffs malingering for the purpose of achieving secondary gain.
***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff has failed to prove that he is totally disabled. N.C. Gen. Stat. 97-29.
2. Disability for purposes of the Workers Compensation Act refers to the impairment of the injured employees capacity to earn wages. In ReStone v. G G Builders, 346 N.C. 154, 44 S.E.2d 365 (1997) ; Fletcher v.Dana Corp., 119 N.C. App. 491, 459 S.E.2d 31, disc. review denied,342 N.C. 191, 463 S.E.2d 235 (1995). Before the Industrial Commission will award an employee disability benefits, the employee must demonstrate both the existence and extent of the disability. Id. Once an employee demonstrates that he is disabled, there is a presumption that the disability lasts until he or she returns to work; however, the employer may rebut this presumption with evidence that the employee no longer suffers the disability. Id. In the instant case, the overwhelming weight of the medical testimony supports the conclusion that plaintiff is able to return to full time employment and that he is malingering in order to continue collecting disability compensation. This evidence is sufficient to support the conclusion that defendant has successfully rebutted the presumption of plaintiffs continuing disability. See In Re Stone v. G GBuilders, 346 N.C. 154, 44 S.E.2d 365 (1997).
3. As of 29 May 1998, the date of the Opinion and Award of Deputy Commissioner Bost in which it was determined that plaintiff did not suffer a disability as defined under the Act as a result of his compensable injury, plaintiff was no longer eligible to receive temporary total disability payments. N.C. Gen. Stat. 97-2(9).
4. Defendant is entitled to a credit for any temporary total disability payments made to plaintiff after 29 May 1998, as these payments were not due and payable when made. N.C. Gen. Stat. 97-42.
***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Plaintiffs claim for permanent and total disability benefits is DENIED.
2. As of 29 May 1998, the date of the Opinion and Award of Deputy Commissioner Bost, defendant is not required to continue to pay plaintiff temporary total disability payments. Insofar as payments have been made subsequent to that date, defendant is entitled to a credit.
3. Each side shall bear its own costs.
This the ___ day of June, 1999.
S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
S/_____________ THOMAS J. BOLCH COMMISSIONER
DSC:jbd