# Richmond

## JOHN HILL V. COMMONWEALTH.

January 12, 1933.

Present, All the Justices.

The opinion states the case.

*Oliver A. Pollard* and *Richard H. Mann,* for the plaintiff in error.

*John R. Saunders, Attorney-General,* and *Edwin H. Gibson* and *Collins Denny, Jr., Assistant Attorneys-General,* for the Commonwealth.

CAMPBELL, C. J., delivered the opinion of the court.

John Hill was indicted in the Hustings Court of the city of Petersburg, for the murder of Nancy Bolling, was tried by a jury, found guilty of murder in the first degree and sentenced in accordance with the verdict, to a term of thirty years in the penitentiary. A writ of error having been awarded by one of the justices of this court, the case is before us for review.

The refusal of the court to set aside the verdict as contrary to the law and evidence is assigned as the first error committed by the court.

A careful examination of the voluminous record clearly reveals that the evidence introduced on behalf of the Commonwealth and of the accused is in irreconcilable conflict. In the elaborate briefs submitted by the learned counsel for the Commonwealth and the accused, the discussion has covered a wide range and evinces the conscientious endeavor of counsel to protect the rights of the accused and of the Commonwealth. However, in our opinion, the legal

principles governing a decision of the case at bar are so deeply rooted in our jurisprudence that it becomes unnecessary to discuss *seriatim* the numerous contentions raised in the briefs.

In *Scott* v. *Commonwealth*, 143 Va. 510, 129 S. E. 360, following a long line of decisions of this court, it is held that if there is one principle firmly established in this State, it is, that a verdict of a jury, upon conflicting facts, under proper instructions, will not be disturbed by the appellate court unless plainly wrong or manifestly against the weight of the evidence.

In *Burton* v. *Commonwealth*, 108 Va. 892, 62 S. E. 376, and the succeeding cases prior to the revision of the Code in 1919, it was held that a motion to set aside a verdict of guilty, in a criminal case, was heard as upon a demurrer to the evidence, and it was the duty of the court to consider whether or not the evidence was sufficient to sustain the verdict. That rule of decision was slightly changed by the revision and a much simpler rule of decision was substituted by the enactment of section 6363 of the Code, which provides: "* * * the judgment of the trial court shall not be set aside unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it." See Judge Burks' Address on the Code of 1919, 5 Va. Law Reg. (N. S.) 97, 130. See, also, notes to section 6363, Code 1930.

The credibility of the Commonwealth's witnesses having been established, and all conflicts in the evidence having been resolved in favor of the Commonwealth, by the verdict of the jury, stamped with the approval of the trial court, the sole question for our determination under the first assignment of error is, does it appear from the evidence that such judgment is plainly wrong or without evidence to support it?

There was no eyewitness to the shocking murder of Nancy Bolling and necessarily the reliance of the Commonwealth, to sustain the conviction of the accused, is based

upon circumstantial evidence. In the recent case of *Clarke* v. *Commonwealth, ante,* page 908, 166 S. E. 541, decided at the November term, 1932, the legality of a conviction based upon circumstantial evidence is fully dealt with and it is needless to reiterate the unanimous view of this court on the subject.

On Friday morning, May 1, 1932, the corpse of Nancy Bolling was discovered lying just inside of the open front doorway of her home, situated on Gressett street. The examination of the coroner and police officers disclosed that the body was lying in a pool of blood. Further examination disclosed the deceased had received a gun-shot wound in the left side of the chest, near the heart, and that death resulted therefrom. The body was fully clothed, and in line with the head of the body a sawed off, double-barreled shot gun was found resting against a table, with the end of the barrel on the floor. The character of the wound, the position of the gun and the position of the body refute any suggestion of suicide. The shot gun contained one empty shell and one loaded shell. Blood was found smeared on the crosspiece of the screen door, also a blood track showing the imprint of a right shoe measuring 11 3/4 inches from end to end, and measuring 2½ inches in width. Another partial imprint of a bloody shoe was found near the edge of the outside porch.

Nancy Bolling was a known "bootlegger" to whom the accused regularly supplied liquor. For a long period of years the accused, a married man and the father of several children, had been criminally intimate with the deceased, and at frequent intervals visited her home, both in the day and nighttime.

Nancy Bolling, on the night prior to the discovery of the corpse, had been visited by five men. Three of the men left the house before midnight, leaving therein the woman and two men, Eddie Brown and Roosevelt Street. During the stay of the visitors the woman was lying in a bed, undressed. After the departure of the three men, Street

went into an upstairs front bedroom and went to sleep; Brown remained seated beside the bed occupied by the woman. The accused, at approximately 2:30 in the morning, climbed on the roof of the front porch and entered through the window the room occupied by the woman and Brown. The accused approached the woman, and in an angry tone of voice asked her why she did not open the door for him. After arising from the bed she replied that she did not hear him. Thereupon, the accused struck her about the head and remarked (according to Brown): "If I had a gun, I would blow your damned brains out," and, according to Street who was awakened by the noise, "I ought to blow your damned head off."

Notwithstanding the familiarity of the accused with the house, he then told the woman to go with him downstairs and let him out of the house. As they went down the steps, according to the testimony of one of the witnesses, the accused called the woman a vile name and he heard a blow struck. After the blow was struck, the accused was heard to remark: "You wait here until I come back." The accused then departed in an automobile.

Brown and Street immediately left the house and then observed that Nancy Bolling was outside of the house, barefooted and dressed only in her nightgown.

William Putney, who lived in the second house to the deceased, testified that some one knocked on his door; that he did not answer the alarm but did look at the clock and observed that it was twenty minutes to three o'clock.

E. M. Jackson testified that on his way to work at the Ellerslie Dairy Plant he was passing the corner of Gressett and Porterville streets, at about 3:25 a. m., and saw an automobile backing down Gressett street in the direction of the Bolling house; that approximately thirty minutes thereafter he heard a report which he thought was that of a pistol; that he then went into the boiler room to make a fire, and as he came out of the boiler room he heard an automobile traveling fast on Gressett or Porterville street; that

before hearing the automobile he had heard a motorcycle "start up" near the ice plant.

Elnora Winston testified that she occupied a front bedroom of her house, situated on the next block from the Bolling house on Gressett street; that on the morning in question she had gotten up to answer a call of nature, and as she started back to bed she heard the report of a gun in the direction of the Bolling home; that she got in bed, pulled the cover over her head and then heard the running of an automobile; that she raised up in bed, pulled the window shade aside, and on looking out the window, saw what appeared to be a motorcycle proceeding up Halifax street; that as she continued to look, she saw an automobile coming from the direction of the Bolling house, and as it passed under her window she recognized the automobile as being that of the accused.

A police officer, Hogan, testified that on the morning of the homicide he left the new market on Halifax street, traveling on a motorcycle, at two minutes to four o'clock a. m.; that he traveled a short distance on Halifax street to the ice plant, where he parked his motorcycle, went across the lot of the ice plant to see about a horse he had left there earlier in the night, came back to the motorcycle and proceeded up Halifax street, down Jones street to the corner of Westly street, and as he turned the corner he met and passed the accused driving his automobile; that he continued his journey one block to Federal street, one block on Federal to Anne street, thence to the corner of Anne and Jones streets, where the shop of the accused is located; that, upon his arrival, he observed the automobile parked across the street from the shop and saw the accused in the act of entering his shop; that he called to the accused and when the accused came to him he observed blood on the shirt front of the accused; that he asked him how he got the blood on his shirt front and accused replied that he had been in a fight with a boy down the street. The officer fixed the time of this conversation at approximately eight minutes after

four o'clock, relying upon the fact that after he left the accused he proceeded up Jones to Halifax street, up the latter street to a police call box and registered at 4:15 o'clock a. m.

Upon the discovery of the corpse, the police officers began an immediate investigation and soon succeeded in taking in charge the five persons who were visitors at the home of Nancy Bolling on the night preceding the murder. Diligent search was made for the accused, but he could not be found by the city officers during the two days following the homicide. It does appear, however, that in the meantime the car of the accused was seen in Kenbridge, about fifty miles from the city of Petersburg, and in the afternoon of the same day the accused drove to the home of one Albert Woodson and requested that he be permitted to go to sleep there; that while the accused was asleep, a local officer came to the home to inquire about the automobile, he having been informed of its whereabouts. Woodson awoke the accused and informed him that an officer wished to see him; thereupon the accused left the Woodson home, ran into the woods nearby and abandoned his automobile. On Saturday night the accused surrendered to the Petersburg officers.

Though emphatically denied by the accused, the Commonwealth proved by Elnora Winston and three other witnesses that the accused had made repeated efforts to bribe Elnora Winston to leave the city, so that she would not be available as a witness against him. The price offered Elnora to suppress the alleged fact that she had seen the car of the accused coming from the direction of the Bolling house immediately after she heard the report of the gun, ranged from seventy-five to four hundred dollars. When linked with the statement of Hogan that he saw the accused at the unusual hour of 4:08 a. m. and that he had blood on his shirt front, the evidence of Elnora Winston seems conclusive that the accused had the opportunity of committing the crime.

The accused, to sustain his plea of not guilty, relied upon

an alibi which the jury were warranted in disbelieving. The accused sought to account for the blood upon his shirt by introducing evidence to show that the blood came from the nose of one Beatrice Taylor, one of his women, with whom he had a "tussle" prior to his visit to the home of Nancy Bolling.

In view of the statement of Hogan that the accused accounted for the blood on his shirt as a result of a fight with a boy, it is not strange that the jury discredited the account later given by the accused and his witnesses.

Counsel for the accused forcefully argue that the blood tracks found by the officers, the failure of the Commonwealth to establish the ownership of the gun and the absence of blood on the car of the accused are undisputed facts inconsistent with the guilt of the accused. Granted, for the sake of argument, that the contention is correct, it does not override the pregnant facts heretofore detailed, which we think conclusively point to the accused as the perpetrator of the crime. That the accused, on the night of the homicide, was consumed with jealous rage is not a conjecture but a clear legal inference to be drawn from the evidence of the witness Street. The vile and unmentionable epithet which the accused applied to Nancy Bolling as he was leaving the house, taken in connection with the second assault upon her and his injunction to her to remain at the house until his return, clearly indicates to us, as it did to the jury, his murderous intent.

Of all the human passions which supply a motive for the commission of crime, history records that jealousy is paramount. Here we have it to a marked degree, combined with those other elements of time, place, means and conduct. When there is a concurrence of those elements, there follows but one logical conclusion—that accused is guilty.

There is no merit in the first assignment of error.

It is further assigned as error that the court erred in giving this instruction:

"The court instructs the jury that the defendant, John

Hill, stands indicted, and is on trial, for the killing of Nancy Bolling, and not for any other offence; and the jury cannot and should not, in determining the guilt or innocence of Hill, consider any evidence of adultery on his part, or of the handling of whiskey by him, or of any other offense committed by him, *unless such evidence as may have been introduced relative to the adultery of the accused, or of the handling of whiskey by him, or of any other offense committed by him, has a distinct bearing on the guilt or innocence of the accused of the offense charged in the indictment.*

*"And the court further instructs the jury that such evidence as may have been introduced in this case relative to the matters set forth above in this instruction can be considered by the jury only in so far as it has a distinct bearing on the guilt or innocence of the accused of the offense charged in the indictment, and shall not be considered by the jury for any other purpose whatsoever."*

The basis of the objection is the language italicized. We are unable to concur in the contention of counsel "that the evidence as to each or all of the offenses mentioned in the addendum could not have a distinct bearing on the guilt or innocence of the accused of the offense charged in the indictment."

 That the accused was not to be convicted of murder because he was guilty of minor offenses is emphasized in the instruction, and could not possibly have prejudiced the rights of the accused. The relations of the accused and Nancy Bolling were open to investigation and were a part of the *res gestae.* As was said in *Webb* v. *Commonwealth,* 154 Va. 866, 875, 152 S. E. 366, 368: "Counsel for the accused would have the principal actors enact the drama without any stage setting whatever. * * * * The jury, however, were not to be thus circumscribed in their consideration of the case. They were entitled to know the relations of the parties before and at the time of the homicide."

The third assignment of error challenges the action of the court in giving the following instructions:

"The court further instructs the jury that every homicide in Virginia is presumed to be murder in the second degree. In order to elevate the homicide to murder in the first degree, the burden of proof is upon the Commonwealth, and in order to reduce the offense to manslaughter, or to justify or excuse it, the burden of proof is upon the accused. It is, however, the duty of the jury to consider all of the testimony, no matter by whom introduced, and ascertain therefrom if the accused is guilty or innocent, and if guilty, of what offense."

The objection urged is "that there was no evidence in the case to sustain a verdict of guilty of murder in the first degree."

This assignment of error has been disposed of in our discussion of the first assignment and is without merit.

■ Though not assigned as error, the action of the attorney for the Commonwealth in advising the witnesses for the Commonwealth not to have any communication in regard to the case with counsel for the accused, is severally criticized. We discover no impropriety in the action thus taken under the facts of this case. The fact, as found by the jury, that the accused, of his own volition, was guilty of an attempt to bribe the most important witness against him, well warranted, we think, the caution exercised by the attorney for the Commonwealth.

We find no error in the judgment of the trial court and it will be affirmed.

*Affirmed.*