COURT OF APPEALS OF VIRGINIA


Present: Judges Willis, Elder and Annunziata
Argued at Richmond, Virginia


JOHN JOSEPH WARMOUTH

MEMORANDUM OPINION[*] BY

v.    Record No. 2281-00-2          JUDGE ROSEMARIE ANNUNZIATA
                                         DECEMBER 11, 2001

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF POWHATAN COUNTY
Thomas V. Warren, Judge

D. Gregory Carr (Douglas A. Ramseur; Bowen,
Bryant, Champlin & Carr, on briefs), for
appellant.

Michael T. Judge, Assistant Attorney General
(Randolph A. Beales, Acting Attorney
General, on brief), for appellee.


John Joseph Warmouth appeals his August 24, 2000 conviction by a jury for aggravated malicious wounding on the ground that the evidence was insufficient to prove his guilt beyond a reasonable doubt. For the reasons that follow, we affirm.

I.

Background

On July 23, 1996, Mary Ann Worsham arrived home from work around 11:10 p.m. She locked the front door, made sure the back door was locked, and checked on her two sons before she got ready for bed. From her bedroom, she telephoned Richard

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

Worsham, her future husband.  She ended the call at 11:45 p.m. and went to sleep.

Later that night, Mary Ann awakened startled from a sound. She vaguely recalls that "something was happening and [she] was trying to stop it."  Although she could not clearly remember what happened that night, she remembered feeling nauseated, going to the bathroom and "leaning over the toilet and throwing up blood."  She also recalled being taken from her home by the rescue squad, but remembered nothing else until she awoke from a coma at the Medical College of Virginia (MCV) nine days later.

Mary Ann suffered ten wounds to the right side of her head and all the bones on that side of her head "were crushed to about the size of corn flakes."  As a result of the attack, she lost forty percent of the hearing in her right ear, sustained permanent paralysis of her right eyebrow, permanent brain damage, short term memory problems, dizziness and a "head full of pins and plates."

Dr. Malcolm Bullock, a professor of neurosurgery at MCV, treated Mary Ann as an emergency patient on July 24, 1996. Bullock noted that she was "in a coma, active, moving around, unable to obey commands [and] bleeding heavily from a number of head wounds" on the right side of her head.  Dr. Bullock believed many of the wounds were "most likely" inflicted by an instrument "like a hammer."  The results of a CAT scan showed several blood clots pushing on Mary Ann's brain.  Dr. Bullock

observed that "brain material was actually oozing out of some of the wounds in the temporal region." Her injuries resulted in substantial scarring of the temporal lobe, which put her at permanent risk for seizures and infection in her cranial cavity.

Mary Ann was married to John, the appellant, for almost fourteen years. At the time of the offense, Mary Ann and John had been separated for almost ten months and had two sons, who were nine and eleven years old. Their divorce became final later that year.

In the spring of 1995, Mary Ann and John were experiencing marital difficulties. John declined Mary Ann's suggestion to attend marriage counseling. At the same time, Mary Ann's employer at the funeral home, Matt Bennett, began making advances toward her. She entered into an affair with him, which ended quickly.

Mary Ann told John of the affair, hoping he would accede to her request to work on their marriage. John, whom Mary Ann described as "very cold and unfeeling," refused. After three or four months of failure to convince John to work on their marriage, Mary Ann and he discussed separating and eventually signed a separation agreement at the end of September 1995. John moved from the marital residence on October 1, 1995.

On November 21, 1995, Mary Ann found John waiting for her at the house when she returned from grocery shopping. John explained that he wanted to ask her "some questions," and she

agreed.  He specifically wanted to know about "this Richard Worsham" whom the boys had mentioned to him.  She explained that she met Worsham after they had separated and that Worsham had taken her and the boys fishing.  John asked her if she planned on dating Worsham.  When she answered, "its possible," John "jumped up in a fit of rage and slammed his fists into the sliding glass door" with such force that he broke one of his hands.  Mary Ann took him to the hospital for treatment and then drove him home.

On December 29, 1995, Mary Ann received a telephone call from Bennett.  Bennett said that John had called Bennett's wife and "told her what was happening."  In response, Mary Ann went to see John at his home that evening.  As she pulled into his driveway, she noticed all of the lights in the house were on and that he was standing in his kitchen with a .45 caliber pistol in his hand.  She told him he was "getting out of control" and that he was only hurting others.  With the pistol still in his hand, John walked over to a couch, sat down and then put the pistol behind a cushion.  In response to Mary Ann's pleas to work things out "civilly," John looked at her "square in the eye" and said, "if I don't like what's happening with you and the boys in the future, I'll kill you and whoever you're with."

A few months later, in April 1996, John drove up to the marital residence and parked next to the garage, which was down the slope of the hill from the house.  The couple's youngest son

went down to the garage and asked his father for his baseball glove, which was in John's truck. John refused. When the boy returned to Mary Ann crying, she went down to the garage and asked John "to please" give her the glove. John again refused, telling Mary Ann "he was in control of what goes on" and that "[h]e was going to call the shots." Mary Ann went back to the house and John shouted vulgarities after her. He refused Mary Ann's pleas to stop so their sons would not hear him, and he refused her request to leave. When she told him she would call the police, John told her to "go right ahead . . . [a]nd he handed [her] the phone." She called the police and they arrived about ten minutes later. After the police talked with John for a few minutes, he left.

In early July 1996, Mary Ann met with John's attorney, Barbara Picard. In response to an inquiry by Picard, Mary Ann stated that a future marriage to Worsham was a possibility.

On July 24, 1996, Mary Ann was attacked in her home. No one else in the house was harmed.[1] She was not sexually assaulted, and nothing was stolen from the house. The police found that neither the windows nor the doors to the home showed signs of forced entry. Mary Ann testified that only she, her mother and John had keys to the house. A spare key was kept in a "fake rock" near the front door; only Mary Ann, her mother, the

---

[1] Mary Ann's disabled mother and the couple's sons were also living in the home at the time of the offense.

babysitter and John knew the location of the spare key.  On the morning of July 24, 1996, the spare key was missing from the fake rock; it was later found in nearby shrubs.

Also that morning, John spoke with his sister, Kathleen Higgins, while he was at work.  At trial, Higgins testified that during that call she informed her brother of the attack, which she learned about from a neighbor.  In cross-examination, however, she admitted that when she had spoken with her brother that morning she had not known that Mary Ann had been "attacked."  Rather, she knew only that "something had happened to [Mary Ann] and she was being taken to the hospital."  After he hung up the phone, John told his supervisor that someone had assaulted his wife.  John's supervisor and a co-worker overhead him ask repeatedly "are my boys okay?" throughout the telephone conversation, but did not hear him inquire about Mary Ann.

When John returned to his house from work that July 24, Detective Vernon Poe of the Powhatan Sheriff's Office was waiting to talk with him.  John agreed to speak with Poe.  He told the detective that he had received a call at work informing him that his wife had been assaulted.  Poe told him that his wife was in critical condition, but that she could give a statement.  When Poe mentioned the possibility of obtaining a statement from Mary Ann, John's demeanor changed.  His hands began to shake, his breathing became shallower, he lost eye contact with Poe and generally "appeared to be nervous."

John told Poe that his friend, Gordon Batterson, had come over to his home the prior evening. The two had a couple of mixed drinks each, consuming about a half-pint of whiskey between them. Batterson left at around 10:30 p.m. John, who lives alone, told Poe that he went to bed shortly thereafter.

Greg Neal, undersheriff with the Powhatan Sheriff's Office, processed the crime scene. Neal observed sheets and pillows saturated with blood, "chunks of hair" on the floor, and blood on the wall, window and in the bedroom's bathroom. He also discovered a bloody palm impression on the bed sheets. Standing at the foot of the bed, the palm print was located on the left-hand side of the bed, towards the headboard. While the impression left clear markings, no ridge detail was discernable.

Robert Hallett, a retired forensic impression examiner employed by the Virginia Division of Forensic Science at the time of the investigation, and qualified by the court as an expert in anatomical impressions, examined the bloody palm impression. He testified that although anatomical impressions do not produce a "positive identification" of the creator of the impression, they do permit an analysis that excludes individuals. Based upon his examination of the impression in comparison with the palm prints of Mary Ann and John, Hallett excluded Mary Ann, but not John, as the source of the impression. Specifically, Hallett found seventeen points of similarity and no points of dissimilarity between the

characteristics of John's known print and that of the impression on the bed sheet. Based upon his examination, Hallett could not eliminate John as the source of the palm impression.

Undersheriff Neal also discovered that the telephones were inoperative and that the telephone line had been cut from the exterior of the home. To see the wire, Neal had to move a garden tool and bend down to within 12-18 inches from the deck itself. John had installed the telephone line wiring when the family moved to the residence in 1991.

Gene Bradbury, a cable splicer with 34 years of experience in telephone repair work, examined the phone lines at the residence and verified that both of the home's phone lines were dead. He discovered that one line had a fresh cut at the bottom of the telephone box that was located approximately two inches off the deck of the house. The cut wire was the bottom wire, the only live wire. Two uncut lines were covering it such that the cut wire could not be seen from a standing position. Bradbury testified that despite his experience in telephone line repair, he would not be able to determine by looking at the wires in the box which were "live" and which were not. He noted that without prior knowledge of how the phone lines had been set up, one would have to look at the wires in the pedestal on the side of the road or open the telephone company side of the phone box with a 2/16 or 3/8 ratchet to determine that only the bottom wire was live. Further, Bradbury testified that if he wanted to

disable all the phone service in the house, he would have cut all the wires.

On July 26, 1996, two days after the attack, Mary Ann's brother found a screwdriver on her lawn. The name of John's employer, "McLean Rentals," was imprinted on the screwdriver. At trial, Mary Ann testified that John always carried a similar screwdriver in his pocket and that she did not keep such objects around the house for the children's safety. She also noted that she had mowed the lawn three days before the attack and had not come across the screwdriver.

## II.

### Analysis

John contends the evidence is insufficient to support his conviction for aggravated malicious wounding. Specifically, he argues that the evidence did not support a finding that he was the individual who committed the assault. We disagree.

In reviewing the sufficiency of the evidence, "[t]he appellate court has the duty to examine the evidence that tends to support the conviction and to uphold the conviction unless it is plainly wrong or without evidence to support it." Tarpley v. Commonwealth, 261 Va. 251, 256, 542 S.E.2d 761, 763 (2001) (citations omitted); Code § 8.01-680. "[W]e consider the record 'in the light most favorable to the Commonwealth, giving it all reasonable inferences deducible therefrom.'" Watkins v. Commonwealth, 26 Va. App. 335, 348, 494 S.E.2d 859, 866 (1998)

(citation omitted).  Furthermore, the credibility of witnesses and the weight assigned their testimony are matters exclusively for the jury.  Yarbrough v. Commonwealth, 258 Va. 347, 364, 519 S.E.2d 602, 610 (1999).  Therefore, we do not substitute our judgment for that of the jury.  Hunley v. Commonwealth, 30 Va. App. 556, 559, 518 S.E.2d 347, 349 (1999) (citing Cable v. Commonwealth, 243 Va. 236, 239, 415 S.E.2d 218, 220 (1992)).

> When the evidence is wholly circumstantial
> . . . all necessary circumstances proved
> must be consistent with guilt and
> inconsistent with innocence and exclude
> every reasonable hypothesis of innocence.
> The chain of necessary circumstances must be
> unbroken. Nevertheless, it is within the
> province of the jury to determine what
> inferences are to be drawn from proved
> facts, provided the inferences are
> reasonable related to those facts.  The
> burden is upon the Commonwealth to prove
> beyond a reasonable doubt that motive, time,
> place, means, and conduct concur in pointing
> out the accused as the perpetrator of the
> crime.

Inge v. Commonwealth, 217 Va. 360, 366, 228 S.E.2d 563, 567-68 (1976) (citation omitted); see also Stamper v. Commonwealth, 220 Va. 260, 272, 257 S.E.2d 808, 817 (1979).  "'[E]ach of the five circumstances of time, place, motive, means and conduct' need not be proved beyond a reasonable doubt."  Fordham v. Commonwealth, 13 Va. App. 235, 238, 409 S.E.2d 829, 831 (1991) (quoting Cantrell v. Commonwealth, 229 Va. 387, 397, 329 S.E.2d 22, 29 (1985)).  However, "those circumstances which are proved must each be consistent with guilt and inconsistent with

innocence, and . . . consistent with each other." Id. We find the circumstances proved exclude the possibility of John's innocence and support his conviction beyond a reasonable doubt.

In this case, the evidence that each of the five circumstances of time, place, motive, means and conduct point to John is ample. First, the Commonwealth presented credible evidence from which the jury could reasonably conclude that John had a motive to harm Mary Ann. John behaved violently towards Mary Ann on at least three occasions. On one occasion, when Mary Ann told John she might date another man, he flew into a rage and slammed his hand against a glass door with such force that he broke his hand. See Hill v. Commonwealth, 159 Va. 993, 1001, 167 S.E. 264, 267 (1933) ("Of all the human passions which supply a motive for the commission of crime, history records that jealousy is paramount."). On another, just seven months prior to the crime, John had threatened, "if I don't like what's happening with you and the boys in the future, I'll kill you and whoever you're with." See Clay v. Commonwealth, 262 Va. 253, 258, 546 S.E.2d 728, 730 (2001) (noting that threats to kill victim were probative of defendant's intent to commit murder). On yet a third occasion, John verbally assaulted Mary Ann and would not leave her home until the police spoke with him.

Second, the jury could infer that John claimed he was asleep at the time of the crime in order to conceal his guilt. See Price v. Commonwealth, 18 Va. App. 760, 768, 446 S.E.2d 642,

647 (1994) (finding that jury may conclude appellant lied during his testimony to conceal his guilt). The appellant offered no evidence to support his explanation of his whereabouts at the time of the assault. Thus, the circumstance of "time" points to John.

Third, the Commonwealth's proof amply established John's access to the "place" of the crime and the "means" he employed as the perpetrator. His familiarity with the house, possession of a key, knowledge of a spare key, access to a screwdriver found on Mary Ann's lawn, and unique knowledge of the phone lines, coupled with the fact that the perpetrator cut the one and only wire out of three that was necessary to disable the phones, established John's opportunity to commit the crime and the means he used.

Fourth, John's conduct and statements following the attack concur in signaling him as the criminal agent. John told his supervisor and Detective Poe that his wife had been assaulted, even though no one had informed him of any such attack. See Bramblett v. Commonwealth, 257 Va. 263, 277, 513 S.E.2d 400, 409 (1999) (finding that defendant's statements evidencing knowledge of the circumstances of the murders supported his conviction for murder). In addition, when he allegedly learned of Mary Ann's injury, he did not inquire into her condition or appear concerned. See Bowie v. Commonwealth, 184 Va. 381, 392, 35 S.E.2d 345, 350 (1945) (holding that lack of sympathy for victim

is probative of guilt).  Furthermore, John became nervous when Detective Poe told him that he thought Mary Ann would be able to provide a statement.  His hands began to shake, his breathing became shallow, and he lost eye contact with the officer.

In addition, the Commonwealth's expert found a hand impression at the scene of the crime, which could not eliminate John as the criminal agent.  See Epperly v. Commonwealth, 224 Va. 214, 228, 294 S.E.2d 882, 890 (1982) (noting that circumstantial evidence comes in infinite variety and it is unnecessary to create artificial rules as to the species of circumstantial evidence which the jury may consider); see also Calhoun v. Commonwealth, 35 Va. App. 506, 509, 546 S.E.2d 239, 241 (2001) (noting that evidence is relevant if it has any logical tendency, however slight, to establish a fact at issue in the case).  In sum, the Commonwealth provided sufficient evidence from which the jury could find that the five circumstances of motive, time, place, means, and conduct "'concur in pointing to [John] as the perpetrator beyond a reasonable doubt.'"  Fordham, 13 Va. App. at 238, 409 S.E.2d at 831 (quoting Cantrell, 229 Va. at 398, 329 S.E.2d at 29 (emphasis in original).

Appellant acknowledges the Commonwealth's evidence, but argues that the circumstances, absent physical evidence, were insufficient to prove he was the perpetrator.  He also alleges that certain evidence is inconsistent with his guilt and that

the evidence does not exclude the possibility that Mark Bennett or his wife was the criminal agent.

Appellant's analysis is flawed in three respects. First, he fails to consider our standard of review which requires this Court to consider the evidence and all reasonable inferences that may be inferred from it, in the light most favorable to the Commonwealth. DeAmicis v. Commonwealth, 31 Va. App. 437, 440, 524 S.E.2d 151, 152 (2000) (citation omitted). Second, John's claimed hypothesis of innocence is predicated on a motive to harm his wife by Mark Bennett or Bennett's wife, that someone other than John could have used the spare key, and that "any intruder" was capable of figuring out how to cut the only live wire. Assuming without deciding that John's hypotheses of innocence are reasonable and "flow from the evidence," Hamilton v. Commonwealth, 16 Va. App. 751, 755, 433 S.E.2d 27, 29 (1993), the Commonwealth's evidence, taken as a whole, excludes them. Harrell v. Commonwealth, 11 Va. App. 1, 9-10, 396 S.E.2d 680, 684 (1990) (citations omitted). "[I]t frequently happens that the combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion." Peoples v. Commonwealth, 147 Va. 692, 704, 137 S.E. 603, 606 (1927) (internal quotation omitted). Finally, contrary to John's contention, we have no requirement that the Commonwealth produce physical or scientific evidence to support a conviction. See, e.g., Carter v. Commonwealth, 223

Va. 528, 531, 533, 290 S.E.2d 865, 866, 867 (1982) (holding evidence of possession of tools with intent to commit larceny sufficient despite absence of physical evidence); Verlander v. Commonwealth, 5 Va. App. 482, 483, 487, 364 S.E.2d 531, 531, 534 (1988) (holding evidence of robbery and felony murder sufficient despite absence of physical evidence); Yates v. Commonwealth, 4 Va. App. 140, 143, 145, 355 S.E.2d 14, 15, 16 (1987) (holding evidence sufficient to support conviction for robbery and use of firearm in commission of felony despite absence of physical evidence).

For these reasons, we find that the Commonwealth has met its burden of proving the charge beyond a reasonable doubt and affirm the conviction.

Affirmed.