COURT OF APPEALS OF VIRGINIA

**UNPUBLISHED**

Present:   Judges Russell,* Friedman and Callins
Argued at Salem, Virginia


CHARLES LEROY HOLMAN

MEMORANDUM OPINION** BY
v.       Record No. 0830-21-3      JUDGE DOMINIQUE A. CALLINS
                                     JULY 12, 2022

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF ROCKBRIDGE COUNTY
Christopher B. Russell, Judge

Kelsey Bulger, Senior Assistant Public Defender (Virginia Indigent
Defense Commission, on briefs), for appellant.

Sharon M. Carr, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Charles Leroy Holman appeals his convictions for first-degree murder, aggravated

malicious wounding, abduction by force, armed burglary with intent to commit a felony,

unauthorized use of a vehicle, and three counts of using a firearm during the commission of a

felony.  Holman contends that (1) the circuit court erred by failing to conduct further inquiry into

defense counsel's alleged conflict of interest, in violation of Holman's Sixth Amendment right to

assistance of counsel, and (2) the circuit court erred by denying Holman's motion to suppress the

statements he made before being given a *Miranda* warning, in violation of Holman's Fifth

Amendment right against self-incrimination.  For the following reasons, we disagree and affirm

Holman's convictions.

---

* Justice Russell participated in the hearing and decision of this case prior to his investiture
as a Justice of the Supreme Court of Virginia.

** Pursuant to Code § 17.1-413, this opinion is not designated for publication.

## BACKGROUND

On April 5, 2019, Holman hatched a scheme to meet face-to-face with his former girlfriend, Christina Martin ("Christina"). Holman abducted Christina's former co-worker, Debbie Holloway ("Debbie"), at Debbie's house and forced Debbie to lure Christina to her home to help with some vehicle problems. Christina drove to Debbie's house with another co-worker, Kimmie McKinney ("Kimmie"), who sat in the passenger seat. After Christina pulled up to Debbie's house, Holman appeared in the doorway brandishing a handgun, and Christina immediately sped off. Holman then took the keys to Debbie's vehicle and chased after Christina. Meanwhile, Debbie escaped to a neighbor's house and called 911 to report the incident. Once Holman caught up to Christina's vehicle, he rammed into the vehicle three times, forcing it to flip over into an embankment. With Christina and Kimmie trapped inside the vehicle, Holman approached with a rifle, told Christina "You just remember this is from me," and fired a single bullet into Christina's chest. Holman then fled in Debbie's vehicle. Police officers eventually arrived on the scene and attempted to provide medical care to Christina and Kimmie. Christina died from the gunshot wound, and Kimmie suffered a permanent shoulder injury from the vehicle crash.

Police eventually spotted Holman in a Lexington DMV parking lot. Holman stood in the corner of the lot holding a handgun to his head. Around the same time, some officers found Debbie's vehicle in an Advance Auto Parts parking lot nearby. Several police officers surrounded Holman with their guns drawn, and Holman shouted multiple times for the officers to shoot him. Holman eventually threw the handgun to the ground. The officers then swarmed Holman, who laid on the ground, and placed him in handcuffs. The police later determined that the gun Holman threw down was fake.

As Holman lay on the ground in handcuffs, Investigator Andrew Ehrhard ("Investigator Ehrhard") of the Rockbridge Sheriff's Office, one of the officers that had first responded to the scene, engaged in the following exchange with Holman:

[EHRHARD]: Charles, you have anything else on you that's going to hurt us, buddy?

[HOLMAN]: Nope.

[EHRHARD]: Alright. You got anything in your pockets that's going to poke us, stick us? Anything like that?

[HOLMAN]: The real gun is over in the other parking lot in Debbie's truck. That one's a fake.

[EHRHARD]: When you say, "the real gun," what are you talking about?

[HOLMAN]: The one that I shot Christina with.

[EHRHARD]: You shot Christina with that gun?

[HOLMAN]: Not that. That's a toy gun.

[EHRHARD]: Where's Christina at now?

[HOLMAN]: Christina's in the car.

[EHRHARD]: Christina—is she the one in the car?

[HOLMAN]: Yea.

[EHRHARD]: You shot her with the gun that's in your car?

[HOLMAN]: I shot her with the [unintelligible].

[EHRHARD]: Why'd you do that?

[HOLMAN]: Just get me out of here.

[EHRHARD]: Alright, we'll get you out of here.

Police then transported Holman to the Rockbridge Sheriff's Office, where he was given a *Miranda* warning for the first time and was interviewed by the police.

Holman was eventually indicted for first-degree murder under Code § 18.2-32, aggravated malicious wounding under Code § 18.2-51.2(A), abduction by force under Code § 18.2-47(A), armed burglary with intent to commit a felony under Code § 18.2-91, grand larceny of a vehicle under Code § 18.2-95(ii), three counts of using a firearm during the commission of a felony under Code § 18.2-53.1, and possession of a firearm by a convicted violent felon under Code § 18.2-308.2(A).[1]

A. The Motion to Suppress

Holman moved to suppress, among other things, the statements he made at the DMV parking lot in response to Investigator Ehrhard's questions before being given a *Miranda* warning. A hearing on the motions was held at the Rockbridge County Circuit Court.[2] Investigator Ehrhard testified at the suppression hearing. He explained that before responding to the "person of interest" at the DMV parking lot, he was aware of both the reported armed robbery at Debbie's house and the vehicle accident that turned into a female with a gunshot wound, but that "the situation was actively developing," and he "didn't know all the details of what had actually occurred." Investigator Ehrhard then testified that "a question that I ask with every arrest is do you have anything on you that will poke us or stick us?" to ensure that "there [are] not any additional weapons or any items on [the suspect] that would injure officers." Investigator Ehrhard explained that he asked Holman questions about the "real gun" and about Christina because he initially thought the handgun Holman had been carrying was real; he was "vaguely familiar with the names involved"; he "vaguely knew that Christina was potentially the

---

[1] Holman's charge for possession of a firearm by a convicted violent felon was *nolle prossed* by the Commonwealth.

[2] Holman also moved to suppress the statements he made during his police interview at the sheriff's office. The Commonwealth conceded to suppression of the statements Holman made after invoking his right to counsel, and the circuit court granted Holman's motion to suppress the statements he made at the sheriff's office before being given a *Miranda* warning.

- 4 -

same woman in the vehicle [accident]"; he didn't "necessarily at this point even [know] who Christina was or where she was in what vehicle"; and he "did not understand the totality of the situation, including the link between . . . the wreck of the vehicle and the [armed robbery]."

The circuit court denied Holman's motion to suppress, finding that the public safety exception[3] to *Miranda* applied to the statements Holman made to Investigator Ehrhard at the DMV parking lot. Although finding that Holman "was in custody when he was on the ground and surrounded by law enforcement," the circuit court concluded that Investigator Ehrhard "had no clear understanding of everything that had gone on despite maybe having a text message or hearing some radio traffic" and that Investigator Ehrhard's actions were not "the product of deliberate deception, falsehood or any police misconduct."

### B. The Conflict of Interest

Holman's arraignment was held on April 2, 2021, and the circuit court entered pleas of not guilty to Holman's eight indictments. During the arraignment, Holman expressed to the court his dissatisfaction with defense counsel, Assistant Public Defenders Teresa Harris ("Ms. Harris") and Mary Hill ("Ms. Hill"), about what he described as their lack of communication with him. Holman added that he thought his constitutional rights were being violated because Ms. Harris "represented Christina Martin's sister, brother and niece in multiple cases . . . not long before I got locked up" and Ms. Harris "made this aware to me two to three months after she was appointed to me." Holman then stated that he "asked [Ms. Harris] to find out about it, if it was a conflict of interest but she never did" and that "the next time that I stated it to [Ms. Harris] . . . she, again, played it off like it was no big deal." Holman finally pleaded, "[H]ow can I ask for fairness if this woman refuses to step down? How do I know that the

---

[3] *New York v. Quarles*, 467 U.S. 649 (1984).

- 5 -

information that the Commonwealth has given to [defense counsel] is not stepped on by [Ms. Harris] because of her concerns for the Martin family?"

Later in the arraignment, Ms. Hill stated to the court that "[Holman] has made it clear that he is very unhappy with the relationship he has with us. To mention, for lack of better terms, the total breakdown in communication between him and between his attorneys." Ms. Hill then stated, "Based off that, Judge, I would request that you consider his request to have new counsel appointed." The circuit court, finding that no request for new counsel had been made by Holman, responded that Holman "basically just made a speech," that "I don't see any motion to withdraw," and that "I wouldn't be inclined to grant it." The court then asked Holman if he had anything else he wanted to say, to which Holman responded, "No sir." At the conclusion of the arraignment, the court provided Holman with access to the jury deliberation room to communicate with defense counsel for as long as he needed. The court also remarked to Holman that "what you told me about a lack of communication and a lack of information does not match the reality of the history of the case." Neither Holman nor his counsel made further mention of the alleged conflict of interest during the rest of the arraignment or at any of the subsequent proceedings before trial.

Holman's six-day jury trial began on April 19, 2021. Christine's sister, brother, and niece were not called as witnesses by the Commonwealth, nor had they any other type of involvement in Holman's trial. Additionally, the issue of Ms. Harris's alleged conflict of interest did not emerge at any point during the trial. The jury ultimately found Holman guilty of seven of his eight charges,[4] and he was sentenced to two life sentences, plus sixty-five years' imprisonment. This appeal followed.

---

[4] For Holman's grand larceny of a vehicle charge, he was convicted of the lesser-included offense of unauthorized use of a vehicle under Code § 18.2-102.

ANALYSIS

I. Holman's Sixth Amendment Claim[5]

The Sixth Amendment of the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. "A defendant's right to counsel under the Sixth Amendment is violated by 'an actual conflict of interest [that] adversely affected his lawyer's performance.'" *Kenner v. Commonwealth*, 71 Va. App. 279, 297 (2019) (alteration in original) (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980)). "[I]f the possibility of a conflict of interest is apparent, a trial court has a duty to conduct further inquiry to determine if an actual conflict exists." *Dowell v. Commonwealth*, 3 Va. App. 555, 559 (1987). Yet "[t]he mere possibility of a conflict of interest, which is not apparent or to which no objection is made, prompts no need for a trial court to conduct further inquiry." *Id.* A trial court must conduct further inquiry into an alleged conflict of interest "only when 'the trial court knows or reasonably should know that a particular conflict exists'—which is not to be confused with when the trial court is aware of a vague, unspecified possibility of conflict." *Mickens v. Taylor*, 535 U.S. 162, 168-69 (2001) (citation omitted) (quoting *Sullivan*, 446 U.S. at 347). Holman's argument that the circuit court deprived him of his Sixth Amendment right to counsel "raises a constitutional question subject to *de novo* review in this Court." *Deluca v. Commonwealth*, 73 Va. App. 567, 575 (2021).

"Trial courts must rely in the first instance upon the good faith and good judgment of defense counsel who have an ethical obligation to avoid conflicting representation and to advise

---

[5] By alleging to the circuit court that Ms. Harris had a potential conflict of interest based on her prior representation of Christina's relatives, Holman stated his objection with reasonable certainty and therefore preserved this issue on appeal. Rule 5A:18. Moreover, Holman took no actions that would constitute an express waiver of this objection. *See Brown v. Commonwealth*, 279 Va. 210, 217 (2010) ("[I]f a trial court is aware of a litigant's legal position and the litigant did not expressly waive such arguments, the arguments remain preserved for appeal.").

the court promptly when a conflict of interest arises." *Dowell*, 3 Va. App. at 559. This is because defense counsel "is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial." *Sullivan*, 446 U.S. at 347 (quoting *Holloway v. Arkansas*, 435 U.S. 475, 485 (1978)). Even so, "trial courts have a duty to closely monitor cases involving multiple representation '[s]ince a possible conflict inheres in almost every instance of multiple representation.'" *Dowell*, 3 Va. App. at 559 (alteration in original) (quoting *Cuyler*, 446 U.S. at 348). Virginia attorneys are bound by Rule 1.7 of the Virginia Rules of Professional Conduct, which prohibits a lawyer from representing a client "if the representation involves a concurrent conflict of interest." A concurrent conflict of interest exists if "there is significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer." Rule 1.7(a)(2).

The mere fact that Ms. Harris represented Christina's sister, brother, and niece in unrelated matters does not rise to the level of an apparent conflict of interest. *See Cantrell v. Commonwealth*, 229 Va. 387, 393-94 (1985) (holding that an attorney "necessarily incurs a conflict of interest" to "the level of an overwhelming probability" where the attorney "undertake[s] the civil representation of a victim, or the family of a victim, of a crime whose perpetrator he must [also] prosecute" as a special prosecutor). The record does not reflect that Ms. Harris continued to represent Christina's relatives through the time of the arraignment, nor does Holman so allege. Christina's sister, brother, and niece were not co-defendants at Holman's trial, nor were they called as witnesses by the Commonwealth to testify against Holman—circumstances that, if alleged, could have raised an apparent conflict of interest.[6] *See*

---

[6] The only relative of Christina's that the Commonwealth called to testify at trial was Christina's mother, Susie Ann Martin.

*Dowell*, 3 Va. App. at 561 (holding that the Commonwealth's elicitation of testimony from two witnesses whom defense counsel was also representing in connection with the defendant's same offense "was sufficient to bring to the court's attention a conflict of interest and to trigger an appropriate inquiry"). Holman's proffer, on its face, did not demonstrate that Ms. Harris's prior representation placed her in the position of having to "serve two masters" at the same time and be thus "infect[ed] . . . with the possibility [of] private vengeance" against Holman. *Cantrell,* 229 Va. at 393-94; *see also Turner v. Commonwealth*, 259 Va. 816, 819-20 (2000) (holding that defense counsel's seeking of employment with the Commonwealth's Attorney's office during the defendant's trial proceedings did not rise to the level of an apparent conflict of interest, since defense counsel "had done nothing more than file the application" with the Commonwealth's Attorney's office).

Ms. Harris, as counsel, was in the best position to determine whether her prior representation of Christina's sister, brother, and niece would pose a significant risk of materially limiting her ability to represent Holman. Ms. Harris had the specific knowledge regarding the nature of her prior representation of Christina's relatives, what legal responsibilities she owed to them, and whether those responsibilities could be jeopardized during Holman's trial. Yet Ms. Harris herself never alleged that her prior representation of Christina's relatives created a potential conflict of interest. *See Carter v. Commonwealth*, 11 Va. App. 569, 574 (1991) (holding that where defense counsel's motion to withdraw specifically alleges that the ability to represent a client has been seriously compromised, the trial court knew or should have known "a potential conflict of interest clearly existed"). And the concerns raised on Holman's behalf about what he perceived as a lack of communication from his counsel did not suggest that Ms. Harris was disregarding her ethical duties as an officer of the court and acting directly contrary to Holman's interests. A conflict of interest implicates a circumstance that "*affect*[s] *counsel's*

*performance*" and does not raise "a mere theoretical division of loyalties." *Mickens*, 535 U.S. at 171; *see also Spence v. Commonwealth*, 60 Va. App. 355, 370 (2012). We decline the invitation to impose a duty on the trial court to conduct further inquiry based on Holman's speculative allegation that, because Ms. Harris had represented Christina's relatives, Ms. Harris deliberately withheld information from Holman out of her bias in favor of Christina's family. Because Holman raised no apparent possibility of a conflict of interest, the trial court was not under any duty to conduct further inquiry into the alleged conflict of interest.

## II. Holman's Fifth Amendment Claim

The Fifth Amendment of the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "Where an accused in a criminal case is subjected to custodial police interrogation, he first must be advised of his Fifth Amendment rights as defined in *Miranda v. Arizona*, 384 U.S. 436 (1966), for any statement he makes to be admissible in evidence." *Commonwealth v. Thornton*, 24 Va. App. 478, 488 (1997). "Whether the circumstances . . . [are] such as to require *Miranda* warnings is a mixed question of law and fact. On appeal, we review such questions *de novo* but defer to the fact-finder's findings of historical fact unless they are plainly wrong or without evidence to support them." *Spinner v. Commonwealth*, 297 Va. 384, 392 (2019). "[W]e also view the evidence in the light most favorable to the prevailing party . . . together with all inferences that may reasonably be drawn from it." *Id.*

"Whether a suspect is 'in custody' under *Miranda* is determined by the [totality of the] circumstances of each case, and 'the ultimate inquiry is simply whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with formal arrest.'" *Ford v. Commonwealth*, 28 Va. App. 249, 256 (1998) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). "[T]he term 'interrogation' under *Miranda* refers not only to express questioning,

- 10 -

but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). "Volunteered statements of any kind are not barred by the Fifth Amendment," *Miranda*, 384 U.S. at 478, and thus "are unaffected by *Miranda*'s precautionary evidentiary rules," *Thomas v. Commonwealth*, 72 Va. App. 560, 578 (2020).

Finally, "there is a 'public safety' exception to the requirement that *Miranda* warnings be given before a suspect's answers may be admitted into evidence, and . . . the availability of that exception does not depend upon the [subjective] motivation of the individual officers involved." *New York v. Quarles*, 467 U.S. 649, 655-56 (1984). The public safety exception to *Miranda* applies when a police officer's questions to a criminal suspect "relate to an objectively reasonable need to protect the police or the public from any immediate danger." *Id.* at 659 n.8. Additionally, "nothing in *Quarles*, limits the application of the public safety exception to questions about the location of a missing weapon." *Anderson v. Commonwealth*, 279 Va. 85, 92 (2010). Rather, "the application of the public safety exception is to be determined by the particular circumstances surrounding the need for a police officer to ask questions to protect the safety of the public and the officer." *Id.*

Assuming without deciding that Holman was in "custody" for the purposes of *Miranda* while he was on the ground in handcuffs at the DMV parking lot, we hold that Investigator Ehrhard's questions and Holman's responses were not made in violation of Holman's Fifth Amendment right against self-incrimination. Investigator Ehrhard's initial questions to Holman ("[Y]ou have anything else on you that's going to hurt us, buddy?" and "You got anything in your pockets that's going to poke us, stick us? Anything like that?") were routine questions for police safety that were normally attendant to arrest and custody, and therefore did not constitute

"interrogation" for the purposes of *Miranda*.[7]  *See Innis*, 446 U.S. at 301.  Moreover, these questions were not reasonably likely to elicit an incriminating response from Holman, as Investigator Ehrhard, who thought the handgun Holman had been holding was real, could not have reasonably expected that Holman would respond, "The real gun is over in the other parking lot in Debbie's truck.  That one's a fake."  Finally, Holman's response about the "real gun" was a volunteered statement by Holman, and thus is not protected under the Fifth Amendment.  *See Miranda*, 384 U.S. at 478.

We conclude that Investigator Ehrhard's subsequent question ("When you say, 'the real gun,' what are you talking about?") falls under the public safety exception to *Miranda*.  Investigator Ehrhard believed that the handgun Holman had been holding was real.  Thus, Holman's sudden revelation about the "real gun" located in a vehicle in a public parking lot created an objectively reasonable need for Investigator Ehrhard to inquire further to determine whether the real gun posed an immediate risk of danger to either the public or the police.  *Cf. Quarles*, 467 U.S. at 657 (public safety exception applied when a police officer asked about the location of a handgun discarded in a supermarket after the suspect had recently committed rape); *Shelton v. Commonwealth*, 34 Va. App. 109, 118 (2000) (public safety exception applied when a police officer asked about the location of a handgun discarded in a residential neighborhood after the suspect had recently committed carjacking).  We do not construe Investigator Ehrhard's question as designed to elicit incriminating information from Holman, but as Investigator Ehrhard naturally following his "legitimate instincts when confronting [a] situation[] presenting a danger to the public safety."  *Quarles*, 467 U.S. at 659.

---

[7] At oral argument, Holman argued that *Miranda* warnings were required before Investigator Ehrhard asked Holman "Anything like that?"  However, we construe this question as simply another question relating to police safety during Holman's arrest and custody, rather than a vague question designed to elicit incriminating statements about weapons in other locations not immediately accessible to Holman.

In response to Investigator Ehrhard's question about the "real gun," Holman voluntarily confessed to murdering Christina, stating: "The one that I shot Christina with."  This self-incriminating statement, like Holman's statement about the real gun, was volunteered by Holman, and thus is not protected under the Fifth Amendment.  *See Miranda*, 384 U.S. at 478. We also conclude that Investigator Ehrhard's subsequent four questions ("You shot Christina with that gun?"; "Where's Christina at now?"; "Christina—is she the one in the car?"; and "You shot her with the gun that's in your car?") also fall under the public safety exception to *Miranda*.[8]  At the hearing on Holman's motion to suppress, Investigator Ehrhard testified that during the events leadings up to his encounter with Holman, he had faced an actively developing situation with limited information and that he did not necessarily know who Christina was and whether her location had been discovered by the police.  Thus, Investigator Ehrhard's questions to Holman about Christina were based on an objectively reasonable need to obtain more information about a woman that Investigator Ehrhard had just learned had been shot by Holman and was potentially needing emergency medical care.  That this emergency pertained to a wounded woman, and not a discarded handgun, does not render the public safety exception to *Miranda* any less applicable, as "nothing in *Quarles*[] limits the application of the public safety exception to questions about the location of a missing weapon."  *Anderson*, 279 Va. at 92.

---

[8] Investigator Ehrhard's final question to Holman ("Why'd you do that?") does not fall under the public safety exception to *Miranda*, since this question was not based on an objectively reasonable need for Investigator Ehrhard to obtain medical care for Christina.  However, we conclude that any use of Holman's answer during Holman's trial is "harmless beyond a reasonable doubt," *Sanchez v. Commonwealth*, 41 Va. App. 340, 353 (2003) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)), since there is no reasonable possibility that Holman's non-responsive answer ("Just get me out of here") contributed to the jury verdict.  *See id.* (holding that constitutional error was harmless beyond a reasonable doubt because "there was no 'reasonable possibility' that the 'error contributed to the verdict'" (quoting *Tuggle v. Netherland*, 79 F.3d 1386, 1392 (4th Cir. 1996))).

CONCLUSION

We hold that the circuit court did not err by declining further inquiry into defense counsel's alleged conflict of interest, and the circuit court did not err by denying Holman's motion to suppress the statements he made before being given a *Miranda* warning. Thus, neither Holman's Sixth Amendment right to assistance of counsel, nor Holman's Fifth Amendment right against self-incrimination were violated. Accordingly, we affirm Holman's convictions.

*Affirmed.*